Argued September 15, 1937; affirmed February 1, 1938

# PACIFIC TELEPHONE & TELEGRAPH COMPANY *v.* WALLACE

(75 P. (2d) 942)

In Banc.

*McDannell Brown*, of Portland (Alfred P. Dobson, of Portland, on the brief), for appellant.

*Fletcher Rockwood* and *Omar C. Spencer*, both of Portland (Carey, Hart, Spencer & McCulloch, of Portland, on the brief), for respondent.

This is an appeal by the Commissioner of Public Utilities of this state from a decree of the circuit court which holds invalid that part of an order made by the commissioner October 11, 1934, prescribing the rates to be charged by the plaintiff, beginning November 1, 1934, for its local exchange service in this state. The remainder of the order was approved by the circuit court; it prescribes 3.995 per cent of the value of the

company's depreciable telephone plant as the rate which it may charge in the future for its depreciation reserve account. The decree was based upon findings of fact and conclusions of law.

ROSSMAN, J. The issues presented by this appeal concern the validity of that part of an order made by the Public Utilities Commissioner of this state, which lowers plaintiff's charges for local or exchange telephone service. The order is challenged by the plaintiff in attacks upon the commissioner's findings which fix the value of the plaintiff's plant, and which determine the amount of its net income after the commissioner had readjusted its revenue and expenses.

On March 25, 1931, the Honorable Charles M. Thomas, who was then Public Utilities Commissioner of this state, instituted on his own motion a proceeding for an investigation before himself of the rates, charges, practices, etc., of the plaintiff, and also for the purpose of "making such findings and entering such order or orders as may be necessary to remove any unreasonableness, unjust discrimination or other unlawfulness which may be found." We shall hereafter refer to the plaintiff as the company.

January 9, 1934, the presentation of testimony before the commissioner began. Before it had concluded on August 15, 1934, testimony had been taken which, as transcribed, covers 2,248 pages, and documentary evidence had been introduced which, later bound in volumes, constitute 26 volumes. In addition to these exhibits 28 other volumes somewhat smaller in size were introduced, two of which are publications of the Interstate Commerce Commission and 26 are the annual reports by the company to the commissioner. October 11, 1934, the commissioner made the order which is now

under attack. By it he directed the company (1) to reduce its local exchange rates, beginning November 1, 1934, approximately 8 per cent; and (2) to reduce its annual depreciation reserve charge to 3.995 per cent of its "depreciable telephone plant excluding general shop, store, stable and garage equipment and general tools and implements." Had the rate reduction been applicable to the company's 1933 business its net income would have been $314,177 less. Thirteen days after that order had been entered the company instituted the suit which is now before us on appeal by filing a complaint which, after alleging that the rates then in effect were "not compensatory," averred that the rates prescribed by the commissioner would result in the confiscation of the company's property, in violation of provisions of the federal and state constitutions. Pending the determination of the outcome, the circuit court restrained the enforcement of the commissioner's order. In January, 1935, after the commissioner had filed an answer, testimony was taken before the circuit court which comprises 219 typewritten pages, and additional exhibits were received which now constitute another volume. The cause was then remanded to the commissioner, as required by law, for his further consideration. January 28, 1935, he reaffirmed the order of October 11, 1934, and returned the matter to the circuit court. June 4, 1936, the court entered its findings of fact and on the same day filed the decree which is the subject matter of this appeal. It held invalid that portion of the commissioner's order which reduced the exchange rates, but approved the remainder of the order which prescribed an annual depreciation reserve charge of 3.995 per cent of the value of depreciable telephone plant. From that part of the circuit court's order which disapproves the new exchange rates the

commissioner appealed. The company has taken no appeal; therefore, the sole issue before us concerns the validity of that part of the commissioner's order which establishes the rates for exchange service. By exchange service we mean all telephone service rendered without resort to another exchange or long distance wires, and by toll service we mean long distance service. Another word for toll service is interexchange service. These technical terms are not ours—we have borrowed them from the record. The company renders four classes of service: (a) exchange, or local service; (b) intrastate toll service; (c) interstate toll service; and (d) teletype and other non-telephonic communication service. Only the exchange rates are affected by this proceeding.

After the commencement of the suit Commissioner Thomas was succeeded by Mr. Frank C. McColloch, and the latter was succeeded by the present commissioner, Mr. N. G. Wallace.

The Pacific Telephone & Telegraph Company, which was incorporated under the laws of the state of California December 31, 1906, and to which we have heretofore referred as the company, renders the service above summarized in the states of California, Oregon, Washington, Idaho and Nevada. It does so, in part, directly and, in part, through other corporations which it controls through ownership of stock. The principal controlled corporations are the Home Telephone & Telegraph Company of Southern Oregon, the Bell Telephone Company of Nevada, the Home Telephone & Telegraph Company of Spokane, and the Southern California Telegraph Company. The plaintiff owns 99.04 per cent of the common stock of the first of these four companies and 100 per cent of the common stock of the other three. Throughout this decision, where dis-

tinction is necessary, we shall refer to the company itself as the Pacific Company, and to the company plus its subsidiaries as the Pacific System. According to uncontradicted data compiled by the plaintiff, 14.1 per cent of the Pacific Company's investment in telephone property is in Oregon, and approximately 8.3 per cent of the Pacific System's is in Oregon. The company claims that 83.4 per cent of its investment in Oregon is devoted to intrastate telephone use. The remainder renders interstate and non-telephone service. December 31, 1933, the American Telephone & Telegraph Company, a New York corporation, owned 85.26 per cent of the plaintiff's common and 78.17 per cent of the plaintiff's preferred stock. At that time the plaintiff had outstanding $82,000,000 of preferred and $180,-500,000 of common stock. At the same time its bonded indebtedness aggregated $50,124,000. Its books indicate that its total assets at that time were worth $404,842,-766.62. The above, we hope, will render more understandable the controverted matters which we shall now mention.

The commissioner found that on December 31, 1933, "the fair value of the local exchange properties" of the company within this state, "used and useful for the convenience of the public," was $15,900,000, and that the fair value of its intrastate toll properties at the same time was $4,925,000, or a total of $20,825,000. The circuit court found that on December 31, 1933, the fair value of plaintiff's Oregon local exchange property, used and useful in the public service, was $20,-790,000, and that its property devoted to intrastate toll business was fairly worth $5,481,000, totaling $26,271,-000. It also found that all of the plaintiff's property in this state devoted to telephone service was fairly worth $31,500,000. Expressed in percentages, the commis-

sioner found that 65.47 per cent of the property was devoted to exchange and 17.7 per cent to intrastate toll service. The remainder of the property was devoted to interstate use. The circuit court found that 66 per cent was devoted to exchange and 17.4 per cent to intrastate toll use.

The company's 1933 Oregon gross revenue was $6,-857,187.42. It claimed that only $558,061.70 of this gross was net revenue. The commissioner revised charges against gross and also the company's distribution of gross between exchange and toll. After so doing he found that the net revenue produced by exchange business was $1,166,719.56 or 7.34 per cent of the sum of $15,900,000 (his valuation of all property devoted to exchange business). He also found that if the reduced rates under attack had been in effect in 1933 the net revenue would have produced a yield of "5 1/4 to 6 per cent on exchange properties." The circuit court, after making some alterations in charges against gross, found that the company's net Oregon revenue from exchange business in 1933 was $733,555 or a return of 3.5 per cent upon the court's finding of the value of all property devoted to local exchange business ($20,790,-000). The difference between the commissioner's and the court's net, apart from some minor items, arises out of the following circumstances: (1) The court disapproved the commissioner's reduction, to the extent of $137,293, of the company's 1933 general office salary expense, and his reduction, in the amount of $121,-364.80, of the company's 1933 exchange repair expenditure; (2) the court disapproved the commissioner's act in transferring to exchange $151,430.32 of the company's 1933 income after the company had entered that sum upon its books as toll revenue; (3) the commissioner held that of the company's gross 1933 current

maintenance expense (telephone removals and changes) amounting to $367,992.05, exchange should bear only $282,323.50, while the court held that $352,543.12 of this account was chargeable to exchange; (4) of the company's 1933 taxes amounting to $1,059,656.94 the commissioner assigned $717,293.61 to exchange while the court assigned $757,254.44 to that service; and (5) the two disagreed upon the method to be employed in distributing revenue and expense between exchange and toll. The commissioner's decision is published in 8 P. U. R. (N. S.) 61, and the court's in 13 P. U. R. (N. S.) 337.

The above indicates the issues of fact between the parties.

██ The commissioner challenges the propriety of the court's act in departing from his findings, claiming that an administrative finality is attached to them which the court improperly disturbed. This contention, together with the company's denial thereof, is argued extensively in the briefs and apparently considerable time was devoted to it in the circuit court. The latter, in a decision which gives much evidence of careful preparation, stated its disposition of this issue in the following language:

"Our function, therefore, is not to substitute our judgment as to the wisdom of legislative action or to make rates, but rather to determine a purely judicial controversy, adjudicating only such issues of law or fact as may be required to test the validity of the commissioner's action.

"Since the rate order is an exercise of power delegated by statute, we must determine the question (purely of state cognizance) whether the commissioner acted within his jurisdiction and according to the laws of Oregon. Since the order has been challenged upon constitutional grounds, we must also test it by the standards of the fourteenth amendment."

"Oregon law imposes upon the commissioner the duty to value all the property of the utility actually used and useful for the convenience of the public (Oregon Code, 61209), * * * Unreasonable rates are prohibited and he is empowered to fix reasonable ones (Oregon Code, 61243, 61-251). Such orders when made are prima facie lawful and reasonable, subject, however, to judicial review by suit (Oregon Laws, 1933, Chapter 441).

"Our immediate inquiry relates to the weight which we should give to the commissioner's order in the trial of this suit which is brought to set it aside. The statutory language clearly implies that the order is not conclusive on the court. Since the order is made conclusive in the absence of suit, the words 'prima facie lawful and reasonable' must apply to the only other possible situation, the event of suit. To rule otherwise would be to delete the prima facie clause from the statute. A prima facie case is such as will 'suffice, until contradicted and overcome by other evidence'.

"The statute (Oregon Code 61-254, as amended 1933 Laws, Chapter 441, p. 829) further provides that suits brought to review the commissioner's order shall be tried and determined as a suit in equity, which is suggestive of the procedure whereby our supreme court, upon a record made below, tries the facts 'anew without reference to the findings' (Oregon Code 6-202). It clearly repudiates the idea that the review should be limited to questions of law. It is also provided that the transcript of testimony taken by the commissioner 'shall be received in evidence in the reviewing court with the same effect as if said evidence had been given and said proceedings had upon the trial' (1931 Laws, Chapter 103, Section 7). Finally, the statute imposes the burden upon the utility of proving by clear and satisfactory evidence that the order is unreasonable or unlawful (Oregon Code 61-258).

"Thus, so far as the express wording of the statute is concerned, we find no limitation upon our power to weigh the evidence except that, as in all cases, we must weigh it under the rules of evidence concerning burden of proof and the like. * * *

"It is essential that we remember the exact nature of this case. The order promulgates a general rate schedule. It is based on a general valuation of all of the utility property in Oregon. It is challenged on the ground that the order will not permit the utility to earn a fair return on the fair value of the property. The plaintiff relies upon the due process clause of the federal constitution. * * *

"Although it is now beyond question that the courts must exercise an independent judgment upon law and facts when the issue of substantive confiscation is raised, there still remains some question as to the exact meaning of that rule. Legislative action is always supported by a strong presumption of constitutionality, and this presumption has always been extended to decisions of administrative bodies exercising legislative powers. * * * However, the rule requiring clear and satisfactory evidence to overcome the commissioner's findings differs so little in practical effect from the well-recognized rule which strongly presumes the validity of such an order, that we have no doubt concerning the validity of the provision of the Oregon statute.

"We are, therefore, to exercise our own independent judgment as to the law and the facts, subject, however, to the rules of evidence and in recognition of our duty to support the findings of the commissioner, if and when he makes any findings, unless overcome by clear and satisfactory evidence.

"But one question remains for consideration. We have discussed the power and duty of the court to inquire into the facts relative to substantive confiscation. It is no less our duty to test the procedure of the commissioner by the due process clause of the constitution. * * *"

In support of these statements, the circuit court cited, among others, *State Commission v. Wichita Gas Co.*, 290 U. S. 561 (78 L. Ed. 500, 54 S. Ct. 321) ; *United Railways v. West,* 280 U. S. 234 (74 L. Ed. 390, 50 S. Ct. 123) ; *Bluefield Company v. Public Service Comm.*, 262

U. S. 679 (67 L. Ed. 1176, 43 S. Ct. 675); *Keller v. Potomac Electric Co.*, 261 U. S. 428 (67 L. Ed. 731, 43 S. Ct. 445); *Ohio Valley Water Co. v. Ben Avon Borough*, 253 U. S. 287 (64 L. Ed. 908, 40 S. Ct. 527); Dickinson, Administrative Justice and the Supremacy of Law, p. 168. The commissioner's brief does not appear to take a contrary view of the law, although it argues with spirit that under the circumstances the circuit court should have adopted the commissioner's findings. The commissioner's counsel seems to interpret the legal principle above mentioned as a substantial evidence rule rather than one that entitles the parties to the independent judgment of the court. Without expressly so stating, he implies that any finding made by an administrative official, which is supported by substantial evidence, is binding upon the courts, even though the latter are firmly convinced by the evidence that the finding is erroneous. The commissioner's brief depends much upon *St. Joseph Stockyards Co. v. United States*, 298 U. S. 38 (80 L. Ed. 1033, 56 S. Ct. 720), and cites *Valley & Siletz R. R. Co. v. Thomas*, 151 Or. 80 (48 P. (2d) 358); *Oregon-Washington R. & N. Co. v. Corey*, 120 Or. 517 (252 P. 955); *Hammond Lumber Co. v. Public Service Com.*, 96 Or. 595 (189 P. 639, 9 A. L. R. 1223). We find nothing in the three decisions last mentioned at variance with the language which we quoted from the circuit court decision.

The St. Joseph Stockyards case was not decided by the federal supreme court until after the circuit court decision had been made. From the decision, written by Mr. Chief Justice Hughes, in which four of the justices concurred, we quote:

"The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of

legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. [citations] When the legislature itself acts within the broad field of legislative discretion, its determination are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. [citations] In such cases the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority. But the constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny or determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements

of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. * * * But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. * * * We have said that 'in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' * * * The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. * * *''

It will be observed that there is no conflict between the interpretation of these legal principles by the circuit court and the federal supreme court. We find nothing in the decision just reviewed which supports the commissioner's contention that an administrative finding, supported by substantial evidence, is binding upon the courts, even though the latter, after paying due heed to the fact that the commissioner possessed special fitness, believed from a clear preponderance of the evidence

that the finding was unwarranted. We speak only of cases involving constitutional issues.

In its complaint the company alleges that the rates in effect up to the time of the commissioner's order, which had been established by his predecessor, ''were and are not compensatory and were and are less than just''. It further avers that the new rates ''would result in the confiscation of the property of the plaintiff contrary to the provisions of §§ 18, 20 and 21 of Article I, and of § 4 of Article XI, Oregon Constitution and § 1 of Article XIV of the amendments to the federal Constitution''. That being true, we are well satisfied that the company was entitled to the independent judgment of the courts upon the law and the evidence applicable to the order under attack. In arriving at this independent judgment, the duty devolved upon the court to avail itself of whatever assistance the commissioner's analysis of the record afforded. The help to be derived from any fact-finding agency is necessarily dependent upon its special fitness, upon its impartiality, and the extent to which it analyzes the record into detailed findings supported by accompanying data. An analysis commends itself to the judgment and esteem of all subsequent reviewers when it compiles the essential matters into tabulations, comparing fact with fact, result with result, thereby revealing the truth. Special findings developed in that manner need the help of no makeweights to gain effect for themselves in all subsequent judicial investigations. Notwithstanding these observations, we are required to give effect to the findings of an impartial administrative officer who derived from the legislature authority to investigate, unless a complaining party proves, with the required degree of cogency, that the findings are the means whereby his constitutional rights will be invaded. The

decision written by the circuit court (182 printed pages) indicates, as is evident from the above-quoted passages, that that court correctly understood the duty which devolved upon it. Its many quotations from the commissioner's order and the data assembled by him show that it availed itself of the assistance his analysis of the record afforded. The extent to which the circuit court analyzed the record indicates that it did not propose to disturb any of the commissioner's findings, supported as they were by favorable presumptions, unless the evidence overcame the latter and proved the incorrectness of the finding. As we proceed with the consideration of this appeal, we, too, are bound by the above-reviewed principles of law.

From here on the case presents no unusual issues of law. The principles applicable to it are well settled. The fundamentals are embraced in the following language taken from the *Minnesota Rate Cases*, 230 U. S. 352 (57 L. Ed. 1511, 33 S. Ct. 729, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A 18):

"The property * * * has been devoted to a public use. There is always the obligation springing from the nature of the business in which it is engaged—which private exigency may not be permitted to ignore—that there shall not be an exorbitant charge for the service rendered. But the State has not seen fit to undertake the service itself; and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection which extends not merely to the title but to the right to receive just compensation for the service given to the public."

The first subject of inquiry is the present fair value of the company's property, useful and being used by it in rendering telephone service to the public. The follow-

ing much-quoted language is taken from *Smyth v. Ames,* 169 U. S. 466 (42 L. Ed. 819, 18 S. Ct. 418):

"The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience."

The commissioner found that the portion of the company's property devoted to intrastate service was fairly worth $20,825,000 (exchange $15,900,000, intrastate toll $4,925,000). The circuit court found that the same property was worth $26,271,000 (exchange $20,790,000, and intrastate toll $5,481,000). By fair value the commissioner did not mean reproduction cost new. He considered the cost of reproducing various units of the company's plant, but made no finding concerning reproduction cost of the entire plant. Besides considering reproduction cost, he also gave consideration to various other factors that necessarily have a bearing upon fair value—actual cost, volume of business, opinion evidence, etc. He expressed his conception of fair value thus:

"Fair value is not something that may be determined by some inflexible arithmetical formula or

process, or by theoretical engineering and accounting studies. All these have proper evidential value. Fair value is the result of reasonable judgment applied to all the material facts. This is an everyday business process. It is my duty to consider all of the relevant facts and apply to them common sense, judgment and business experience, and then determine what is the fair value, having regard to the rights of the public and of the company.''

The commissioner included in his estimate of fair value the entire plant as a going operating concern. He provided it with working funds, etc. He, however, excluded from his calculations properties which he did not deem useful to its telephone business. These included some real property which had been purchased for future development and its teletypewriter and other non-telephone equipment.

It will be observed that the difference between the circuit court's finding of fair value ($26,271,000) and the commissioner's ($20,825,000) is $5,446,000. It is not difficult to account for $5,221,358 of the latter.

The commissioner found that in 1933 the company's plant was overbuilt to the extent of $5,221,358. This sum is only $214,642 less than the difference between the commissioner's and the court's valuations. The circumstances which convinced the commissioner that the plant was ''over-abundant'' (to borrow an expression from his counsel), and which also convinced him that $5,221,351 was the true amount of the excess, is indicated, we believe, by the following circumstances. The commissioner found that early in 1930 as a result of the company's construction program it possessed a plant capable of serving 150,000 stations (telephones), but that on August 31, 1934, it was serving only 110,957 stations. Its largest number of active stations was reached in May, 1930, when it had 142,815. In October,

1933, the company had 14,833 so-called left-ins (disconnected telephones) or 13.45 per cent of the active stations. August 31, 1934, it had facilities for 39,043 more stations than users. These circumstances persuaded the commissioner that the plant was excessively large. Referring to its unused facilities, he stated that there were "probably no prospects of their use for an indefinite period". The manner in which the commissioner derived the figure $5,221,358 was not stated by him so far as the record indicates, but his method can be determined from the facts before us. The difference between 150,000 (capacity) and 110,957 (number of stations in use August 31, 1934) is 39,043, or 26.03 per cent of 150,000; 26.03 per cent of $20,825,000 is $5,420,747.50, which is $199,389.50 more than $5,221,358. Apparently the commissioner did not use that method of determining the amount of the excess plant, although it is suggested by his use of some of the above figures. In commenting upon the unused portion of the plant, he set forth an extensive compilation showing the amount of invested capital per thousand calls in 24 items of telephone property in both the years 1930 and 1933. His compilation compares the percentage of increase of 1933 over 1930. The average was 18.17, and 18.17 per cent of $20,825,000 is $3,783,902.50 or considerably less than $5,221,358. Apparently he did not employ the percentage 18.17. The company's brief asserts that the commissioner obtained his figure of $5,221,358 by a method which we shall now describe. Its fixed capital December 31, 1930, was $34,567,575, and its total calls were 289,202,280. The latter number divided into $34,567,575 indicates that it had $119.53 capital per thousand calls in that year. In 1933 the fixed capital was $33,954,833, and the total calls were 240,394,044 or $141.25 per thousand calls—an increase of $21.72 over

1930. When $21.72 is multiplied by 240,394,044 (1933 calls) and the result is divided by 1,000, we have $5,221,358.63, being the exact amount which the commissioner found represented the value of excess plant. It seems safe to assume that this indicates the method whereby the commissioner found that the plant was excessive to the extent of $5,221,358.63. This method would leave the company without even a single extra telephone, foot of wire or crossarm.

 We are well satisfied that the company cannot include within its valuations property which it neither used nor was useful to the public service. Property which was not reasonably necessary to the adequate furnishing of telephone service must be excluded from the rate base: *Los Angeles Gas & Elec. Corp. v. Railroad Commission,* 289 U. S. 287 (77 L. Ed. 1180, 53 S. Ct. 637), and *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439 (47 L. Ed. 892, 23 S. Ct. 571). We shall now analyze the facts. Apparently in 1929 the company was in the midst of an expansion program, for in that year according to the commissioner's order, net additions to its plant aggregated $3,852,541; in 1930 the net additions were $2,469,242, and in 1931 they were $267,140. The expansion program was virtually halted by the end of 1930 and a different course was begun. In 1932 and 1933 retirements from the plant exceeded additions to the extent of $540,940 and $345,210, respectively. In May, 1930, as the commissioner pointed out, the company achieved its largest number of active stations—142,815, which was 7,185 less than capacity. In the five-year period, 1924 to 1929, the average increase in business was 6,024 stations per year, or 1,161 less than 7,185. Hence, had 1930 brought the company its average increase in business it would have had on January 1, 1931, facilities for only about 2,000 more stations than

the business demanded. "Property or equipment provided or acquired in anticipation of reasonable future need should be allowed, even though wholly or partially unused at the time to which the inquiry relates.": 51 C. J., Public Utilities, 16. For an application of that principle sustaining the telephone company, see *Southern Bell Tel. & Tel. Co. v. Railroad Com'n of S. C.*, 5 Fed. (2d) 77. In *Southern Bell Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm.*, 187 La. 137 (174 So. 180, 18 P. U. R. (N. S.) 1), the court approved the action of the Public Service Commission in striking off from fair value 12.5 per cent representing excess plant. This had been built by the end of 1928, but had found no demand by the end of 1936, the latest period of time mentioned in the decision. The depression reduced the demand 18 per cent below the 1928 volume of business. Nothing was stricken off on that account. The court intimated that the 1928 expansion program was ill-advised.

It will be observed that in 1930 the extensive construction program was virtually terminated, yet one year later (May, 1931) the company still had 141,300 active stations, only 1.06 per cent less than the peak of May, 1930, and only 5.8 per cent less than capacity. These facts do not disclose that its construction of additional plant was reckless or unwarranted. Very few foresaw in the early part of 1929 that an economic depression would begin to manifest itself in the latter part of that year, and even when the depression had begun to manifest itself few realized the extent to which business would recede. A construction program once begun cannot be economically concluded the moment adverse conditions appear. After the demands for its services were lessening the company began to adjust itself to the new conditions. Between December 31, 1930,

and December 31, 1933, it reduced its fixed capital (Oregon) from $34,567,575 to $33,954,833, or 1.77 per cent. We have mentioned the left-ins. They appear to be a normal feature of the telephone business. For instance, in 1929 when the average number of active stations was 136,532, the company had 4,660 left-ins, 3.41 per cent of the active stations. In 1930 the left-ins were 6.21 per cent of the active stations. The company presented extensive data showing that in many instances the left-ins shortly become active, and that hence it is economically unwise to remove them upon the occupants' request for a discontinuance of service. In May, 1933, when the orders for discontinuance of service aggregated 2,422 the requests for new service amounted to 1,734, many of the latter being left-ins returned to operation. Apparently the left-ins and the unused facilities were scattered over the entire state. The mere fact that a given number of persons, say, 100, request that their telephone service be discontinued does not enable the company to take down the percentage of poles, crossarms, etc., that the 100 bear to the total number of subscribers. If the left-ins are sufficiently scattered the company may still be obliged to maintain all of the poles, crossarms, exchange equipment, etc., to the same extent as if no requests for discontinued service had been received. Hence, a process whereby a rate-making authority strikes off of total valuation the percentage that the non-used equipment bears to the total may be unjust to the company. For an excellent decision so holding, see *Laclede Gas & Light Co. v. Public Service Commission*, 8 F. Supp. 806. Moreover, in 1931 and 1933, both inclusive, the company retired a total of $339,944.19 of its equipment upon subscribers' premises (telephones, wires, booths, etc.). The commissioner's method would constitute a double

retirement of this property. There would not be even an intimation that the company's expenditures of 1920-1930 were not made in good faith except for a statement appearing in an appendix accompanying the reply brief. It is there suggested that since the American Telephone & Telegraph Company, which owns 85.26 per cent of the plaintiff's common stock and 98.82 per cent of the stock of the Western Electric Company, from which, according to the brief, the plaintiff purchased "most of this equipment", a motive was present for making extravagant purchases. But the managerial discretion, which is vested in all utilities, ought not to be so easily impugned. Much of the expenditures in 1929 and 1930 were due to the company's substitution of dial telephones for manual instruments, a substitution which is not criticized. Apparently this substitution, or some other part of the expenditures, effected a material reduction in the number of employees for we observe that in 1933 when the number of stations was 53 per cent greater than in 1917 the number of employees was 1.30 per cent less. In 1917 the number of stations was 72,388 and the number of calls 146,098,176. In 1933 the number of stations was 110,709 and the number of calls 240,394,044. Thus, in 1933 there were 1.30 per cent fewer employees, 64 per cent more calls and 53 per cent more stations than in 1917. Again, the operating expenses in 1933 were nearly $300,000 less than in 1932 and were lower than any year since 1927. The record does not disclose how much of the equipment purchased in 1929 and 1930 came from the Western Electric Company. Manifestly, much of the expenditure was for labor. We know of nothing in the record indicating that the expenditures were not made in good faith.

For the following reasons we believe that the company did not possess any substantial amount of plant

in 1933 unnecessary to the public service: (1) At least a part of the 1929-1930 expenditures were due to the substitution of dial telephones for manual instruments which, in turn, enabled a smaller number of employees to transact a larger volume of business; (2) the 1929-1930 expenditures gave the plant only 7,185 more telephones than users, providing only a small surplus over the number that the preceding five-year experience indicated could be reasonably anticipated; (3) the fixed capital was reduced 1.77 per cent between 1930 and December 31, 1933; (4) the circuit court's decision, written March 19, 1936, states: ''The evidence satisfies us that the tide is already turning for this company. There were approximately 3,000 fewer left-ins in October, 1933, than in the peak month of September, 1932 (Ex. 17). There was also a net gain of 1,275 active stations between August, 1933, and December, 1933 (the last month shown in the evidence). (Ex. 73).''

By adding to the commissioner's valuation of $20,-825,000 $5,221,358.63 (his valuation of the so-called excessive plant), the fair value of the property becomes $26,046,358, or only $224,642 less than the circuit court's valuation ($26,271,000).

We shall now consider another method of determining the plant's value. The commissioner made no findings concerning reproduction cost new; nevertheless, his order, which assumes the form of a comprehensive opinion, states that in 1916 the entire properties of the company in Oregon, Washington and California were valued by the state commissions of those states, whereupon the company ''segregated the book cost of the properties in the several states. The book cost allocated to Oregon as of December 31, 1916, was $10,120,-847.43 which was substantially less than the value fixed by the Public Service Commission. On December 31,

1933, the book cost of all properties of the company within the state was $34,859,184.62.'' The commissioner then sets forth a tabulation beginning with the year 1916 and ending with the year 1933 which shows the amount of the gross additions and net additions to the company's property in each year. This tabulation shows that in each of the years just mentioned, with the exception of 1932 and 1933, the property added by the company exceeded the amount retired. For instance, in 1923, the gross additions were $4,213,700.45, reduced, however, by retirements to a net addition of $2,826,605. In 1932 and 1933, since the retirements exceeded the additions, the net reductions were $540,940 in 1932, and $345,210 in 1933. Starting with the figure, $10,120,847.43 (book cost December 31, 1916, above mentioned) and adding to it the net additions year by year contained in the commissioner's tabulations, and subtracting the two sums just mentioned, we find that the book cost of the company's property at the close of 1933 was $34,836,-179.43 which, it will be observed, is within $23,005.19 of the sum mentioned by the commissioner. This calculation gives us, we believe, a fair impression of the original cost of the company's property. Original cost in the present instance appears to be a reliable index to prudent investment value.

The circuit court found that on December 31, 1932, the reproduction cost new of the entire property of the plaintiff in this state, used and useful in public service, was $33,536,573, from which it deducted $242,381 for net decrease in the company's 1933 book cost, leaving the reproduction cost new of the plant on December 31, 1933, $33,294,192; subject, however, to existing depreciation which the court found to be 8 per cent of the sum just mentioned, or $2,663,535, leaving as the plant's depreciated reproduction cost new on

December 31, 1933, $30,630,657. In arriving at this total the court ignored six parcels of land of the value of $55,106 purchased by the company for expansion purposes, and all of the company's teletypewriter equipment. It also disregarded a price increase made by the Western Electric Company of 10.2 per cent in 1930 for reasons similar to those mentioned in *Illinois Bell Telephone Co. v. Gilbert,* 3 Fed. Supp. 595, 603. This reduced reproduction cost new to the extent of $789,411. Reproduction cost new, like original cost, is not necessarily controlling. It is entitled, however, to fair consideration, for it is an important factor in the determination of fair value. Claude R. Lester, chief engineer for the commission, in analyzing a reproduction cost new estimate made by C. V. Angove, a witness for the company, indicated an estimate of $32,710,045 which is approximately $2,000,000 more than the court's finding of depreciated cost.

There is no contention that the circuit court in determining fair value employed any improper price schedule, nor any cost item which was unduly high.

Without analyzing the evidence further, it will be observed that several methods of determining value indicate that the circuit court's finding that the entire plant devoted to telephone service was fairly worth $31,500,000 is well supported by proof. The finding deemed the exchange properties fairly worth $20,790,000 and the part devoted to intrastate toll worth $5,481,000. We believe that these values are fair, and we adopt the court's findings in regard thereto as our own. These values divide the plant thus: 66 per cent to exchange; 17.4 per cent to intrastate toll; 16.6 per cent to interstate toll. They determine values as of December 31, 1933. Upon these values the company was entitled to earn a fair return.

It will be recalled that the commissioner, after revising the income and expenditures of the company's intrastate business for 1933, found that, as revised, the net exchange revenue was $1,166,719.56. If the latter is the correct amount, then the company's return upon the fair value of its exchange property, as we have just found it to be ($20,790,000), yielded a return of 5.61 per cent, and if the company's income is reduced $314,177 by the order now under attack the return would be 4.10 per cent.

■ We come now to a determination of whether the commissioner was justified in making the revisions in the company's income and expenditures which we summarized in a preceding paragraph, and which gave it $1,166,719.56 net exchange revenue. In order to get the facts before us once more, we state that the company's net exchange income in 1933 was: $558,061.70, according to the company, (2.68 per cent of $20,790,000); $733,555.00, according to the circuit court, (3.50 per cent of $20,790,000); $1,166,719.56, according to the commissioner, (5.61 per cent of $20,790,000).

Since a determination of net income is dependent, in part, upon the amount which the company could properly place in its depreciation reserve account, we shall first consider this account. The commissioner permitted the company to maintain this account, and the Interstate Commerce Commission recognizes the propriety of such accounts for interstate toll service. The commissioner thus described this account: "Credits to the depreciation reserve are concurrently charged to the operating expense through the account 'Depreciation of Plant and Equipment'. When property is retired its cost is taken out of the capital accounts and its cost, less salvage, plus the cost of removing the property is charged to the depreciation reserve. Broadly

speaking, depreciation is the loss not restored by current maintenance which is due to all factors, defined in expense of depreciation, causing the ultimate retirement of the property. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered.'' The parties are agreed that the straight line method of determining depreciation is proper. This method, according to the commissioner, "is designed to spread evenly over the service life of the property the loss which is realized when the property is ultimately retired from service. According to the principle of this practice, the loss is computed upon the cost of the property as entered upon the books, less the expected salvage, plus the cost of removing the property, and the amount charged each year is one year's pro rata share of the total amount.'' This method results in the use of a percentage of the value of all depreciable property for the purpose of determining the amount to credit to the depreciation reserve fund. For instance, if the average life of all depreciable property is 20 years, the percentage would be approximately 5 per cent. In the 20-year period (June 30, 1912, to December 31, 1932) the average rate used by the company was 5.22 per cent. The exchange depreciation reserve on December 31, 1932, amounted to $6,933,613.72 for Oregon, and at that time the actual existing depreciation was $2,022,887.50. The following items were deemed depreciable: Buildings, Central office equipment, Station apparatus, Private branch exchange, Booth and special fittings, Exchange pole lines, Exchange aerial cable, Exchange aerial wire, Exchange U. G. conduit, Exchange U. G. cable, Ex-

change submarine cable, Toll pole lines, Toll aerial cable, Toll aerial wire, Toll U. G. conduit, Toll U. G. cable, Toll submarine cable, Office furniture and fixtures.

The depreciation fund was not kept separate, but the amounts credited to it were employed in the business like any other money belonging to the company. This is deemed proper: Whitten-Wilcox, Valuation of Public Service Corporations (2d), § 824.

In 1933 the company employed the depreciation rate of 4.56 and obtained $1,456,138 for the depreciation fund. The commissioner held that the rate was too high and reduced it to 3.995, which would have produced $1,304,549. The manner in which he fixed this percentage can readily be determined from a study of an exhibit prepared by his chief engineer Lester. On June 30, 1912, there was in the depreciation reserve $951,047. The actual existing depreciation on December 31, 1932, was $2,843,296. The amount actually charged for depreciation between those two dates was $14,660,235, and the total debits against the fund between those dates were $12,811,433. We copy from Lester's exhibit the following:

"Balance June 30, 1912 ............................$ 951,047.00
Charged Expenses for Depreciation .... 14,660,235.00
Transferred from Willamette Tel. Co. 43,447.00

Total credits ...............................$14,703,682.00
Total debits ................................ 12,811,433.00

Net reserve increase ................$ 1,892,249.00

Balance in reserve December 31, 1932 ..$ 2,843,296.00

The total of the average Fixed Capital in Service for the years June 30, 1913 to December 31, 1932, inclusive, amounts to $366,982,002.00. The amount

that should have been charged to Operating Expenses for the years 1913 to 1932, inclusive, to produce a balance as of December 31, 1932, of $2,843,-296.00 would have been $14,660,235.00 which is 3.995 per cent of the above.*

The amount necessary to have charged for these years to take care of actual experienced depreciation or retirement was $12,811,433.00 or 3.49 per cent of the Fixed Capital.''

*$366,982,002.00

Thus, we see that had the depreciation rate of 3.995 per cent been in effect in that 20-year period enough would have been obtained to take care of all retirements and leave $2,843,296 in the fund December 31, 1932, the exact amount of the actual depreciation on that day. This would have been $4,090,317.72 less than was actually obtained. A rate of 3.49 per cent would have brought the company enough to have paid for all retirements, but would have yielded no balance for the fund. The fund would have remained $951,047, the balance in it June 30, 1932, plus the sum of $43,447, transferred from an absorbed telephone plant. It would have been a retirement fund—not a depreciation fund. The commissioner's opinion develops the same thought. From it, we quote:

''The amount of these charges for that period was $12,811,433 and amounts to 3.49%, the average depreciable fixed capital in service during these years. In other words, 3.49% annual of each year's depreciable fixed capital for the years 1913-1932 would give the amount of property completely consumed. * * * By starting with $951,047, as a balance in reserve on June 30, 1912, and in order to provide an amount sufficient to take care of the total charges to the reserve from June 30, 1912 to December 31, 1932 and at the end to provide $2,843,296 as a balance in the reserve, it would

require an annual credit to the reserve amounting to 3.995% of the average annual depreciable fixed capital. The $2,843,296 is the result of applying the per cent condition found in the field to the fixed capital accounts.''

As the commissioner recognized, it was necessary for two reasons to permit the company to accumulate a fund equal to the existing depreciation: (a) it provided the company with the funds necessary to defray the purchase price of new equipment when the old was retired; and (b) the accumulating cash balanced the receding value of the depreciating property thereby maintaining capital assets in their original amount. Such accumulations are proper: *Railroad Commission of Louisiana v. Cumberland Telephone & Telegraph Co.*, 212 U. S. 414 (53 L. Ed. 577, 29 S. Ct. 357). For instance, if a concern invested its entire capital of $100,000 in equipment worth that amount of money, which in a given period depreciated $10,000, and if the concern accumulated no depreciation reserve the capital assets would be worth at the end of the period, not $100,000 but only $90,000. But if the concern was constantly accumulating a reserve fund equal in amount to the existing depreciation, its capital assets would remain $100,000. In the meantime, its earnings would be real earnings and its capital would remain intact. The commissioner realized this necessity and concluded the paragraph above quoted by stating:

''The commission finds that an amount equal to 3.995% of the depreciable fixed capital should be charged as an expense for depreciation of plant and equipment.''

We have spent considerable time with this phase of the situation because the appellant's brief, in endeavoring to show that the company's exchange department

in 1933 yielded a net revenue of $1,166,719.56, employs valuations and a depreciation rate which are foreign, we believe, to the commissioner's order. We shall now endeavor to so show. In the reply brief it is stated:

"Applying this data to the commissioner's value of $32,364,837.00 (Ex. A148) which after deducting right of way, other general equipment, station installation, drop and block wires, was $29,299,120.00 and then deducting observed depreciation and excess plant left $21,608,658.00 as the value of the depreciable property to which the adjusted depreciation rate of 3.795% was applicable. The average right of way value was $521,-932.00 to which the 2% rate was applicable. Thus the total depreciation expense would be as follows:

$21,608,658.00 at 3.79% .............$820,048.00
$521,932.00 at 2% ...................... 10,039.00
$$\overline{\phantom{xxxxxxxxxxxx}}$$
Total depreciation expense ..$830,087.00

"The company actually charged for 1933 the sum of $1,456,138.00 for depreciation expense. Subtracting the above total, leaves an excess of $626,051.00."

It will be observed that the commissioner's counsel deducted from value the "excess plant", that is, $5,221,351, but, for reasons which we have already stated, we believe that this deduction was not warranted. The record contains no Exhibit A148. To the contrary, it is clearly shown that nothing was so marked. The attention of counsel for both parties was directed to this error, but we were given no citation to any document containing the commissioner's value of $32,364,-837.00. However, commissioner's Exhibit 71, prepared by Mr. Lester, which is the source of the total, $366,-982,002.00 employed by him in compiling the rate of 3.995, lists year by year from January 30, 1913, to December 31, 1933, the average depreciable fixed capital. It uses $32,654,550 as the amount for 1933, and

the commissioner's order uses the same sum. We are satisfied that the total depreciable fixed capital for 1933 was not $32,364,837, but $32,654,550. This sum represents the book investment in all depreciable items (listed in a preceding paragraph). It excludes not only the four items noted in the above excerpt taken from the reply brief but all of the following: Other intangible capital, right of way, land, station installations, interior block wires, other general equipment, interest during construction, miscellaneous construction expense.

It will be recalled that Lester's exhibit which induced the commissioner to prescribe the depreciation rate of 3.995 began with the premise, "the total of the average fixed capital in service for the years June 30, 1913, to December 31, 1932, inclusive, amounts to $366,982,002.00." He did not include 1933 in his total, but in Exhibit 71 listed its amount ($32,654,550.00) immediately below the amount of the 1932 depreciable fixed capital ($32,972,885.00). It seems clear that the rate of 3.995 per cent resulting from the use of the figures compiled in this exhibit must likewise be applied to the same figures when the annual depreciation reserve amount is calculated. Had Lester used a smaller sum for 1932 in obtaining his percentage the percentage would have been larger than 3.995, and, of course, if smaller sums for each of the 20 years had been used the percentage rate would have been much larger. It will be observed that the brief, in explaining how $32,364,837.00 was reduced to $21,608,-658.00, states in part as follows: "Then deducting observed depreciation * * *" we have quoted in a preceding paragraph the commissioner's statement that the depreciation reserve rate under the straight line method (which the company, with the commissioner's approval, employed) "is computed upon the cost of

the property as entered upon the books * * *.''
Manifestly, when computed in that manner it ought
to be applied to cost and not to depreciated value. In
other words, one who has purchased an automobile at
a price of $1,500 which he anticipates will be valueless
in five years, and who desires to accumulate in the
meantime the required reserve to keep his capital as-
sets intact and to enable him at the end of five years
to pay for a new car, will employ a depreciation rate
of 20 per cent of the cost price—not of the depreciating
value of the car. The defendant, in endeavoring to
support his contention that the depreciation rate should
not be applied to book investment, but to depreciated
value, cites *United Railways & Electric Co. v. West,*
280 U. S. 234 (74 L. Ed. 390, 50 S. Ct. 123), but that
decision does not hold that after determining the de-
preciation reserve rate at book investment value, there-
by obtaining a low rate, the latter may be applied to
depreciated value in calculating the annual amount
which may be taken for the depreciation reserve ac-
count. In *Lindheimer v. Illinois Telephone Co.,* 292 U.
S. 151 (78 L. Ed. 1182, 54 S. Ct. 658), Chief Justice
Hughes, after giving a splendid definition of the
straight line method of fixing depreciation charge,
stated:

''According to the principle of this accounting prac-
tice, the loss is computed upon the actual cost of the
property as entered upon the books, less the expected
salvage and the amount charged each year is one year's
pro rata share of the total amount. * * * While
property remains in the plant, the estimated deprecia-
tion rate is applied to the book cost and the resulting
amounts are charged currently as expenses of opera-
tion. The same amounts are credited to the account
for depreciation reserve, the 'reserve for accrued de-
preciation.' ''

It will be observed that the chief justice said "computed upon the actual cost of the property" and "the estimated depreciation rate is applied to the book cost." He did not say that the rate was applied to the depreciated value of the property; that is, to its value after it had been subjected to the wear and tear of service. Had the rate been calculated by the use of depreciated values it would have been 5.89 per cent. We are satisfied that after the depreciation reserve rate had been determined upon the basis of book investment value it would be improper to apply it to depreciated value in determining the needed amount for the depreciation account.

It will be observed from the excerpt taken from the reply brief that the commissioner's counsel uses, not 3.995 but a depreciation rate of 3.795. His justification for the use of the latter arises out of the fact that there is included in Lester's total debit of $12,811,433, which he employed in the calculation previously reviewed, $736,344 for items which, after January 1, 1933, will be charged against the extraordinary repair account. This change arises from new accounting methods. In other words, should these items of expense, which were incurred between 1912 and 1932, be encountered again, payment will come, not out of the depreciation reserve account but out of the extraordinary repair account. By deducting from the appropriate sum $736,344 and then making the calculations made by Lester, we have 3.795 as the depreciation reserve rate. However, the commissioner did not direct the use of that rate. His order was made October 11, 1934, and was reaffirmed by him January 28, 1935, after the additional testimony had been taken in the circuit court. By the use of the depreciation percentage 3.795 the company's depreciation reserve charge for 1933 would have been $1,239,240

or $65,214 less than if 3.995 had been used ($1,304,-549.00) and $216,898 less than the company actually charged ($1,456,138.00). The latter sum is $151,589 more than $1,304,549 and $216,898 more than $1,239,240.

It will be recalled that the circuit court found that the rates prescribed by the commissioner, had they become effective, would have reduced the company's 1933 gross exchange revenue $314,177; thus neither the reduction effected by 3.795 per cent nor by 3.995 per cent equals the loss in revenue made by the attacked order. But it must be borne in mind that neither the sum of $151,589 nor the sum of $216,898 is assignable in its entirety to the exchange department. The charge of $1,456,138 depreciation reserve covers not only the exchange department but also the intrastate and interstate toll department; hence, any saving therefrom must be assigned, in part, to each department of the company which is covered by the charge. As we have already stated, the commissioner found that 65.47 per cent of the company's property was devoted to exchange service. The court's figure was 66 per cent. The latter percentage of $216,898 is $143,152. Thus, the largest possible sum which we have to offset the rate reduction of $314,177 is $143,152.

Before considering the distribution which should be made through this reduction in the depreciation reserve charge, we shall determine the other adjustments in revenue and expense which the commissioner made, but which the circuit court held were unwarranted.

■ We shall now consider the validity of the commissioner's action in reducing the 1933 general office salary account $137,293. The expenditure in 1933 was $288,215.77; thus after the reduction only $90,922 remained. In a tabulation the commissioner compared the amount expended for general office salaries each year

from 1917 to 1934 with the amount expended in 1917 when $31,692.48 was spent. This comparison showed, for instance, that in 1920, 1925, 1930 and 1932 the increases over 1917 were, respectively, 33.11 per cent, 61.94 per cent, 485.60 per cent and 414.65 per cent. The increase of 1933 over 1917 was 620.09 per cent. The same table also compared the gross revenue, the number of stations and amount of wages paid year by year since 1917 with that year. The comparison showed that the general salary account had increased more rapidly that the other three. It also compared the number of employees from 1917 to 1934, showing that although between 1918 and 1933 the number was larger than in 1917, in 1933 it was 1.30 per cent smaller. An exhibit prepared by Mr. Lester, the commission's chief engineer, states in part:

"The general office salary increases have far outstripped other expenses or increases in property. For illustration the comparison of increases for 1932 over 1917 will suffice.

General office salaries _____ 414.65 per cent
Gross revenues _____ 200.23 '' ''
Number of employees _____ .43 '' ''
Average wage per day _____ 119.18 '' ''
Number of stations _____ 82.48 '' ''

It will be noted from the above that general office salaries have far outstripped the growth in employees, wages, stations or revenues. These salaries should be adjusted so as to bring the total more in line with the growth of the property."

The fact that the amount of the general office salary account increased more than the other accounts, and especially the large increase in that account in 1933, influenced the commissioner to make the reduction which is now under review. His findings do not state that the general office account included too many em-

ployees, nor does it criticize the salary paid to any individual although it recites the name of every person who received payment from this account and the amount paid him. Likewise the findings do not contend that the general office account paid for any unnecessary service. In 1925, 1929 and 1933 changes occurred in the company's operations and bookkeeping methods which increased the size of this account independent of any salary increases that may have been made. The change of January 1, 1933, resulted from an order of the Interstate Commerce Commission prescribing a new accounting classification, and the change of 1925 transferred to the general office functions previously performed by other departments. The change of 1929 transferred to this account the financial department and its many cashiers. The amounts involved in these changes were very substantial. Indicating, in part, that these changes did not increase total operating expenses is the circumstance that the operating expenses for 1933 were nearly $300,000 less than for 1932, and were lower than those of any year subsequent to 1927. The various developments and circumstances that resulted in these justifiable increases in the general office salary account are carefully analyzed in minute detail in the circuit court's decision. Although the appellant has filed extensive briefs in this court, they are silent upon this subject. We are convinced that the commissioner's reduction of this account resulted from a misconception of the facts and that it was unwarranted.

We come now to the exchange repair account and the reduction of $121,364.80 which the commissioner apparently made in that account. We say apparently because it is impossible to determine with certainty if any reduction was made. The order criticizes the

size of this account and contains statistics which the commissioner evidently believed indicated that the 1933 exchange repair account was too high. The criticism, however, is not followed by any further mention of the account, yet the rate reduction evidently was based, in part, upon a reduction of this account. The circuit court's decision states that the commissioner "evidently made a reduction from the amount of expense shown by the company's books to have been incurred in that year (1933) for 'exchange repair,' an item of current maintenance. Whether he actually made the reduction, or, if so, what was the amount of it, no one now connected with the case is able to say with any degree of assurance because the commissioner made no definite finding on the subject. * * * This is only one of numerous instances where, owing to the peculiar and evasive manner in which the order is drawn, the Court and counsel and the present Commissioner are compelled to speculate upon what the former Commissioner did before attempting to determine whether what he did was right." The decision then analyzes this account carefully. Next, the court stated: "It is the undisputed evidence that beginning with 1933 the company's accounting classifications were changed by order of the Interstate Commerce Commission (Ex. A-150) with the result that items of current maintenance theretofore charged to other accounts were in 1933 charged to 'exchange repairs.' For 1933 exchange repairs totaled $838,809, of which amount $119,784 would in previous years have been charged to other accounts (Ex. 129, Tr. 2013). Exchange repairs for 1932 were $707,863; for 1933, when reduced to the basis of the old accounting classifications, $719,025, which is but $11,162 more than for the previous year, and $362,-532 below $1,081,557, the 1929 high year."

The decision pointed out that no contention had been made that the services which were paid for by this account were unnecessary, and, likewise, that no contention had been made that the disbursements were made other than in good faith. Although the appellant has filed three briefs in this court, two of them being very extensive, this account is nowhere mentioned in them. The circuit court's disposition of the matter, therefore, remains unchallenged. We are satisfied that the commissioner was not warranted in making this reduction—if he made it.

■ We come now to a consideration of the division, if any, which should be made of the company's revenue and expenses between the exchange department and its other departments. The problem arises out of the circumstance that much of the company's facilities serve jointly the exchange and other departments. For instance, when a subscriber speaks through the telephone upon his desk to a person in some other city he makes use of not only the long distance wires and the toll board but also of facilities of the exchange departments in both cities. Again, a pole installed by the toll department and carrying its wires may also be carrying some wires or other equipment of the local exchange department. These illustrations, to which many others could be added, present the problem of distribution of revenue and expense between the company's departments. The disposition made by the commissioner of this issue is thus stated by him:

"The company's engineers as well as the commission's engineers presented studies on this subject. The company contends for 1933 that 86.5 per cent of the total revenues were intrastate, 71.5 per cent of the total were local exchange, that the intrastate expenses were 86.9 per cent of the total expense, the local exchange expenses were 69.9 per cent of total expenses, the bal-

ance of net revenue for intrastate business was 83.1 per cent of the total balance net revenue, and the local exchange balance net revenue was 86.7 per cent of the total.

"The company assigns part of the exchange revenue to toll on the theory that the telephone and lines to the central office, including local exchange central office are used to deliver toll business to the toll board, and therefore the exchange revenue received should be apportioned between exchange and toll on the basis of use, and assigns the entire toll charge to toll. This contention of the telephone company overlooks the fact that the toll department is an exchange user the same as any other subscriber. To illustrate, A calls B in the same exchange area. * * * The exchange plant in delivering this toll business is used by the toll department to and including the station. The company assigned 20 per cent of its originating toll business to the exchange. The payment made by the subscriber for exchange service is not a part payment for exchange and toll service.

"The company's and the commission's engineers agree on the basis to be used in apportioning to exchange service rents, general office salaries, commercial, traffic and depreciation, although the amounts to be proportioned varied.

"The differences are in taxes and station removals and changes. The taxes were allocated by the commissioner's staff in accordance with the separation of property to the three groups. The station removals and changes were made in accordance with the commercial expenses, as the activities of the commercial department cause changes in stations and service.

"The Pacific Company in its submittals of exchange revenue and expenses assigned part of the toll revenues to exchange income. In making the proper adjustment this part of the toll revenue should be reassigned to toll, making total revenue transfer to toll of $340,-389.25. Also the evidence shows on proper allocation that $615,980.02 of the exchange expenses should be assigned to toll business."

The trial court found that in 1933 66 per cent ($20,-790,000) of the company's property was devoted to exchange use, 17.4 per cent ($5,481,000) to intrastate toll use, and 16.6 per cent to interstate toll and non-telephone use. It held that the commissioner's distribution of revenue and expense was erroneous and approved the distribution which the company had made.

In 1933 the revenues of the company were:

"Local Service .............................$4,997,204.47
Toll Service ............................. 1,765,898.87
Miscellaneous ............................. 173,165.28
Uncollectible* ............................. (79,081.20)

Total .....................................$6,857,187.42"

----------

* The item "Uncollectible" was entered under the head of Revenues because the company is required to deem as revenue everything it is entitled to receive. It, therefore, includes in the items "Local Service," "Toll Service" and "Miscellaneous" all that it is entitled to receive, and next enters "Uncollectible" under the head of Revenue for the purpose of subtraction.

In the same year its expenses were:

"Current Maintenance .............$1,464,811.57
Depreciation ............................. 1,456,138.62
Traffic ................................. 1,004,747.14
Commercial ............................. 568,660.62
General Office Salaries and
 Other ............................. 496,162.49
General Services and
 Licenses ............................. 95,644.27
Taxes ............................. 1,059,656.94
Rents ............................. 67,929.04

$6,213,750.69"

Exhibit 90, prepared by Lester, indicates that as early as 1919 the company, pursuant to the directions of the Public Service Commission (predecessor to the

present commission), had assigned a portion of its originating toll revenues to exchange. By "originating toll revenue" is meant revenue produced by toll business which originates in Oregon as distinguished from toll messages coming into this state from outside points. The exhibit states: "The company since 1924 has allowed only 20% of the originating tolls to be credited to exchange revenues." The amount paid to exchange from toll in 1933 was $289,455.83. It states: "Interexchange (toll) expenses charged exchange income for the years 1932 and 1933 are as follows:

Year 1933

| | |
|---|---:|
| Plant | $ 158,435.65 |
| Station Removal and Changes | 70,028.89 |
| Traffic | 41,601.45 |
| Commercial | 106,769.05 |
| General and Miscellaneous | 50,920.79 |
| Licensee Revenue, Dr. | 4,444.65 |
| Taxes | 133,671.64 |
| Uncollectible | 750.39 |
| Rent Deductions | 12,454.11 |
| | $ 579,076.62 |
| Message tolls | $1,447,279.15" |

By dividing intrastate toll receipts ($1,447,279.15) into $579,076.62 Lester derived the percentage 40, which he thereupon claimed was the proper percentage to be used for distributing toll revenue to exchange. Forty per cent of $1,447,279.15 is $578,911.66.

It will be observed from the language which we have quoted from the commissioner's opinion that he stated: "The company assigns part of the exchange revenue to toll. * * * The company assigned 20 per cent of its originating toll business to the exchange." The two statements are in conflict. It will

also be observed from Lester's computations that instead of the company assigning "part of the exchange revenue to toll" as the commissioner stated, the company, as Lester's exhibit shows, assigned 20 per cent of toll to exchange.

Exhibit 101, page 240, prepared by Lester, states:

"Toll Lines

"The Operating Income as per books for the years ending December 31, * * * 1933, are as follows:

OPERATING REVENUES
1933

| | |
|---|---|
| Toll Service Revenues | $1,476,443.04 |
| Licensee Revenue, Debit | |
| Uncollectible Revenue | (19,449.63)* |
| Miscellaneous Revenues | 6,033.18 |
| Total Operating Revenue | $1,463,026.59 |

DEDUCTIONS

| | |
|---|---|
| Ordinary Repairs | $ 258,010.29 |
| Depreciation | 422,654.45 |
| Traffic Expense | 308,794.99 |
| Commercial Expense | 7,616.98 |
| General Expense | 118,582.62 |
| Uncollectible | |
| Taxes | 236,148.63 |
| Rent Deductions | 9,891.99 |
| Miscellaneous Deductions | |
| Total Deductions | $1,361,699.95 |
| Balance Net Revenue | $ 101,326.64" |

* Figures in ( ) are red.

It is not difficult to determine the manner in which the above sum of $1,476,443.04 was obtained. Exhibit 81, prepared by Lester, shows that the company's annual report for 1933 listed exchange service revenue as

$4,997,204.47, toll service revenue as $1,765,898.87, and miscellaneous as $173,165.28. The same exhibit shows that for 1933 the company entered upon its books for total exchange operating revenues the following amounts:

> Exchange Service Revenues $4,997,204.47
> Toll Service Revenues _____ 289,455.83
> Miscellaneous _____ 167,132.10

This exhibit also indicates that in the same year the company entered as total toll operating revenues the following:

> Toll Service Revenues _____$1,476,443.04
> Miscellaneous _____ 6,033.18

The difference between $1,765,898.87 and $1,476,-443.04 is $289,455.83. It will be observed that the sum just mentioned was taken from toll revenues and given to exchange. Nothing was taken from exchange. Thus, it is seen that the company entered upon its books as "Toll Service Revenue" total toll revenue less $289,-455.83, or $1,476,443.04.

A distribution of revenue between exchange and toll must consider the manner in which the amount of the charge to the customer is determined, that is, it must consider the rate structure.

Apparently, two methods of separation are employed in the telephone industry. One is termed the board-to-board method, and the other is known as the station-to-station method. Briefly described, the board-to-board method deems a sum paid for a long distance call as having been earned exclusively by the toll department. It assumes that the monthly sums paid by the subscriber include a charge for access to the toll board. This method separates the property of the company at the toll board, and, having done so, separates revenue

and expense at the same point. The station-to-station method deems the service attendant upon a long distance call as beginning at the telephone upon the subscriber's desk and extending all of the way to the receiving set of the individual in the other city. It holds that the exchange and toll departments jointly earn the sum charged for the call and, therefore, requires that the amount received must be distributed between the two departments.

The problem of distribution of revenue and expense is solved, in part, when one determines upon what basis the company fixes its charges for service. If the monthly rate paid by the subscriber for the telephone which stands upon his desk includes a payment for his occasional access to the toll board, he should not be compelled to pay again for that service when he places a long distance call. In that event the charge for long distance service should begin only after he is beginning to use the services of the toll department. Therefore, if the exchange department includes in the monthly charge which it bills to its customers a sum for connecting a subscriber with the toll board whenever he desires toll service, it should not receive from the toll department any portion of the amount which the subscriber pays for his long distance calls. Likewise, exchange and toll should each bear alone the expense attendant upon keeping its equipment in repair. But if the monthly bill rendered by the company to the subscriber includes nothing for access to the toll board, and if connection is deemed a special service for which a charge is included in the long distance bill, then a portion of the sum paid for the call ought to be remitted by the toll department to exchange. In other words, if the charge for toll service includes everything from station to station, the toll department ought to be permitted to retain only

that part of the sum paid which pays for the service from board to board. Necessarily, the only way in which one can determine the basis of the charge employed by the company is to examine the record. The record indicates that the company, in determiniing the amount of its charges, employed the board-to-board method. Apparently, there was no controversy upon that subject before the commission, and the entire hearing, so far as it related to the separation of revenue and expense, assumed that the rates were upon the board-to-board basis. The same was true in the trial conducted in the circuit court. The above explanation describes the two methods in their simplest form only; in practice the separation method is more complicated.

F. A. Dresslar, the company's general traffic engineer for Oregon, distributed the above-mentioned items of revenue and expense by the board-to-board method in the following manner:

| | Total | INTRASTATE TELEPHONE | | |
| --- | --- | --- | --- | --- |
| | | Exchange | Interexchange | Total |
| **REVENUES** | | | | |
| Local Service | $4,997,204.47* | $4,945,045.51 | $ 831.02 | $4,945,876.53 |
| Toll Service | 1,765,898.87 | ............ | 917,610.41 | 917,610.41 |
| Miscellaneous | 173,165.28 | 166,952.51 | 6,212.77 | 173,165.28 |
| Uncollectible | 79,081.20 | 58,822.31 | 10,379.04 | 69,201.35 |
| Total | $6,857,187.42 | $5,053,175.71 | $ 914,275.16 | $5,967,450.87 |
| | 100.0 % | | | 87.0 % |
| **EXPENSES** | | | | |
| Current Maintenance | $1,464,811.57 | 1,151,595.50 | 145,829.43 | 1,297,424.93 |
| Depreciation | 1,456,138.62 | 987,527.23 | 230,323.47 | 1,217,850.70 |
| Traffic | 1,004,747.14 | 657,532.14 | 236,723.33 | 894,255.47 |
| Commercial | 568,660.62 | 444,710.58 | 81,575.11 | 526,285.69 |
| General Office Salaries and Other | 496,162.49 | 336,135.04 | 93,072.04 | 429,207.08 |
| General Services and Licenses | 95,644.27 | 77,236.94 | 10,698.05 | 87,934.99 |
| Taxes | 1,059,656.94 | 779,925.38 | 139,347.73 | 919,273.11 |
| Rents | 67,929.04 | 43,891.94 | 14,007.75 | 57,899.69 |
| Total | $6,213,750.69 | $4,478,554.75 | $ 951,576.91 | $5,430,131.66 |
| | 100.0% | | | 87.4 % |
| Balance Net Revenue | $ 643,436.73 | ............ | ............ | 537,319.21 |
| | 100.0% | | | 83.5% |

* In this total there was erroneously included on the company's books $51,327.94 and $831.02 which should have been credited to Interstate and Intrastate Toll, respectively.

At this point it is desirable to note the following taken from *Smith v. Illinois Bell Telephone Co.*, 282 U. S. 133 (75 L. Ed. 255, 51 S. Ct. 65):

"The court found that the Illinois Company owns and operates all the property in the City of Chicago used in interstate calls and connects with the property owned by the American Company at the city limits. In the method used by the Illinois Company in separating its interstate and intrastate business, for the purpose of the computations which were submitted to the court, what is called exchange property, that is, the property used at the subscriber's station and from that station to the toll switchboard, or to the toll trunk lines, was attributed entirely to the intrastate service. This method was adopted as a matter of convenience, in view of the practical difficulty of dividing the property between the interstate and intrastate services. The appellants insist that this method is erroneous, and they point to the indisputable fact that the subscriber's station, and the other facilities of the Illinois Company which are used in connecting with the long distance toll board, are employed in the interstate transmission and reception of messages. While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential (Rowland v. Boyle, 244 U. S. 106, 108; Groesbeck v. Duluth South Shore & Atlantic Railway, 250 U. S. 607, 614) it is quite another matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will bear an undue burden—to what extent is a matter of controversy. We think that this subject requires further consideration, to the end that by some practical method the different uses of the property may be recognized and the return properly attributable to the intrastate service may be ascertained accordingly."

Deeming the language just quoted an indication that the toll department must assign to the exchange department such part of its revenue as is necessary to compensate exchange for the service it renders in handling toll calls, Dresslar made a distribution of Oregon revenue and expense upon a station-to-station basis. Revenue, as well as expense, was distributed because the company contended that its toll rates charged only for the service rendered between toll boards, and that its exchange rates included a charge for the service rendered by exchange in handling long distance calls. The following is Dresslar's station-to-station compilation:

| | Total | Wholly Local Portion of Exchange | Local Portion of Joint Exchange | Intrastate Toll Portion of Joint Exchange | Intrastate Toll Portion of Interexchange | Total Interstate Telephone |
|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | |
| Local Service | $4,997,204.47 | $224,428.42 | $4,568,188.36 | $117,307.47 | $ 831.02 | $4,910,755.27 |
| Toll Service | 1,765,898.87 | ........... | ........... | ........... | 917,610.51 | 917,610.41 |
| Miscellaneous | 173,165.28 | 166,952.51 | ........... | ........... | 6,212.77 | 173,165.28 |
| Uncollectible | 79,081.20 | 9,443.47 | 47,784.56 | 1,226.81 | 10,379.04 | 68,833.88 |
| Total | $6,857,187.42 | $381,937.46 | $4,520,403.80 | $116,080.66 | $914,275.16 | $5,932,697.08 |
| | 100.0% | | | | | 86.5% |
| **EXPENSES** | | | | | | |
| Current Maintenance | $1,464,811.57 | $ 62,078.56 | $1,054,864.42 | $ 26,560.06 | $145,829.43 | $1,289,332.48 |
| Depreciation | 1,456,138.62 | 82,316.48 | 876,361.78 | 22,127.37 | 230,323.47 | 1,211,129.10 |
| Traffic | 1,004,747.14 | ........... | 634,215.90 | 17,239.89 | 236,723.33 | 888,179.12 |
| Commercial | 568,660.62 | 91,637.19 | 341,674.36 | 8,773.58 | 81,573.11 | 523,660.24 |
| General Office Salaries and Other | 496,162.49 | 29,022.06 | 297,329.45 | 7,502.53 | 93,072.04 | 426,926.08 |
| General Services and Licenses | 95,644.27 | 3,542.39 | 71,315.27 | 1,831.30 | 10,698.05 | 87,387.01 |
| Taxes | 1,059,656.94 | 67,535.91 | 689,718.53 | 17,380.49 | 139,347.73 | 913,982.66 |
| Rents | 67,939.04 | 2,712.44 | 39,954.81 | 936.49 | 14,007.75 | 57,611.49 |
| Total | $6,213,750.69 | $338,845.03 | $4,005,434.53 | $102,351.71 | $951,576.91 | $5,398,208.18 |
| | 100.0% | | | | | 86.9% |
| Balance Net Revenue | $ 643,436.73 | $ ........... | $ ........... | $ ........... | $ ........... | $ 534,488.90 |
| | 100.0% | | | | | 83.1% |

In explanation of the foregoing column headings, we state that Dresslar deemed "Wholly Local Revenue" as income earned by private branch exchanges, local private lines, etc. "Local Portion of Joint Exchange" includes all sums paid by subscribers for local calls except service rendered by private exchanges, local private lines, etc. "Intrastate Toll Portion of Joint Exchange" is toll revenue produced by jointly used exchange property devoted to intrastate toll purposes. "Intrastate Toll Portion of Interexchange" is toll revenue produced by interexchange property used for intrastate toll purposes.

Lester, chief engineer for the commission, prepared a compilation segregating revenue and expense between exchange and toll. His compilation is important because it was the basis upon which the commissioner made his distribution of revenue and expense. The following is a copy of his compilation. Forced to economize in space, we have omitted from his table two columns, one of which is entitled Exchange Adjusted and the other Interstate Toll. The present controversy does not concern the latter, and his column entitled Exchange Adjusted contains exactly the same sums as the column entitled Adjusted Exchange.

| 1933 | 1.<br>Total | 2.<br>Intrastate Toll | 3.<br>Total Toll (Adjusted)* | 4.<br>Exchange as Charged | 5.<br>Adjusted Exchange | 6.<br>Adjustment |
|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | |
| Local Service | $4,997,204.47 | $ 831.02 | $ 52,158.96 | $4,997,204.47 | $4,945,045.51 | $ 52,158.96 |
| Toll Service | 1,765,898.87 | 917,610.41 | 1,765,898.87 | 289,455.83 | | 289,455.83 |
| Miscellaneous | 173,165.28 | 6,212.77 | 6,212.77 | 167,132.10 | 166,952.51 | 179.59 |
| Uncollectible | (79,081.20) | (10,379.04) | (20,854.76) | (59,631.57) | (58,226.44) | (1,405.13) |
| Total | $6,857,187.42 | $ 914,275.16 | $1,803,415.84 | $5,394,160.83 | $5,053,771.58 | $340,389.25 |
| **EXPENSES** | | | | | | |
| Current Maintenance | $1,464,811.57 | $ 221,012.57 | $ 418,088.20 | $1,206,801.28 | $1,046,723.37 | $160,077.91 |
| Depreciation | 1,322,446.46 | 229,312.22 | 451,747.71 | 944,667.94 | 870,698.75 | 73,969.19 |
| Traffic | 1,004,747.14 | 253,963.22 | 370,531.24 | 695,952.15 | 634,215.90 | 61,736.25 |
| Commercial | 568,660.62 | 90,348.69 | 135,349.07 | 561,043.64 | 433,311.55 | 127,732.09 |
| General Office Salaries and Others | 496,162.49 | 100,574.57 | 169,810.98 | 395,163.65 | 326,351.51 | 68,812.14 |
| General Service and Licenses | 61,729.80 | 8,086.60 | 13,413.88 | 50,383.86 | 48,315.92 | 2,067.94 |
| Taxes | 1,059,656.94 | 163,700.07 | 342,363.33 | 823,508.31 | 717,293.61 | 106,214.70 |
| Rents | 67,929.04 | 14,944.24 | 25,261.79 | 58,037.05 | 42,667.25 | 15,369.80 |
| Total | $6,046,144.06 | $1,081,942.18 | $1,926,566.20 | $4,735,557.88 | $4,119,577.86 | $615,980.02 |
| Balance Net Revenue | $ 811,043.36 | ($167,667.02) | ($123,150.36) | $ 658,602.95 | $ 934,193.72 | ($275,590.77) |

* Includes both Intrastate and Interstate Toll Revenue. The amount of the latter can be determined by subtracting Column 2 from Column 3.

In order to facilitate a comparison of the results achieved by Dresslar's board-to-board and station-to-station computations with Lester's figures, we set forth in the following table these three compilations.

| | BOARD TO BOARD | | STATION TO STATION | | LESTER'S COMPILATION | |
|---|---|---|---|---|---|---|
| | To Exchange | To Toll | To Exchange | To Toll | To Exchange | To Toll |
| **REVENUE** | | | | | | |
| Local | $4,945,045.51 | $ 831.02 | $4,792,616.78 | $ 118,138.49 | $4,945,045.51 | $ 831.02 |
| Toll | ............ | 917,610.41 | ............ | 917,610.41 | ............ | 917,610.41 |
| Miscellaneous | 166,952.51 | 6,212.77 | 166,952.51 | 6,212.77 | 166,952.51 | 6,212.77 |
| Uncollectible | (58,822.31) | (10,379.04) | (57,228.03) | (11,605.85) | (58,226.44) | (10,379.04) |
| Total | $5,053,175.71 | $914,275.16 | $4,902,341.26 | $1,053,567.52 | $5,053,771.58 | $ 914,275.16 |
| **EXPENSES** | | | | | | |
| Current Maintenance | $1,151,595.50 | $145,829.43 | $1,116,942.99 | $ 172,389.49 | $1,046,723.37 | $ 221,012.57 |
| Depreciation | 987,527.23 | 230,323.47 | 958,678.26 | 252,450.84 | 870,698.75 | 229,312.22 |
| Traffic | 657,532.14 | 236,723.33 | 634,215.90 | 253,963.22 | 634,215.90 | 253,963.22 |
| Commercial | 444,710.58 | 81,575.11 | 433,311.55 | 90,348.69 | 433,311.55 | 90,348.69 |
| General Office Salaries | 336,135.04 | 93,072.04 | 326,351.51 | 100,574.57 | 326,351.51 | 100,574.57 |
| General Services and Licenses | 77,236.94 | 10,698.05 | 74,857.66 | 12,529.35 | 48,315.92 | 8,086.60 |
| Taxes | 779,925.38 | 139,347.73 | 757,254.44 | 156,728.22 | 717,293.61 | 163,700.07 |
| Rents | 43,891.94 | 14,007.75 | 42,667.25 | 14,944.24 | 42,667.25 | 14,944.24 |
| Total | $4,478,554.75 | $951,576.91 | $4,344,279.56 | $1,053,928.62 | $4,119,577.86 | $1,081,942.18 |

The above comparison discloses that Dresslar's board-to-board and Lester's revenue computations produced exactly the same results. Both gave to exchange $5,053,175.71 and both gave to intrastate toll $914,-275.16. Neither took anything from exchange revenues for toll, nor did either take anything from the latter and give it to exchange. The sum of $831.02 which each gave to toll, apparently out of exchange revenue, was not really an assignment of exchange revenue to toll, but was merely the manner in which a correction was made in exchange revenue to conform it to the facts. Total exchange revenue as entered upon the books was $4,997,204.47 which included, through error, $52,158.96 toll revenue ($831.02 intrastate and $51,327.94 interstate toll). Since Dresslar's board-to-board and Lester's computations produced exactly the same result they evidently employed the same process. Dresslar termed his process as the board-to-board method. That process assumes that exchange rates include a charge for giving the patron access to the toll board, and that toll rates charge only for the service between toll boards. Such being true, Dresslar permitted each department to retain all it had received from its rates, and likewise charged up to each department the expense of maintaining its own equipment. The fact that Lester, in computing revenue, reached the same result as Dresslar is an indication that he, too, believed that exchange rates include a charge for permitting the subscriber to have access to the toll board, and that toll rates include nothing for the service just mentioned. If such was Lester's belief, then he, too, subscribed to the board-to-board principle, but, if he did, he departed from it when he distributed the expense items, for his distribution of the latter was clearly made upon the station-to-station basis. He charged against toll $615,980.02 more expense than the company had. Evidently he made this charge

because he believed that exchange equipment in handling toll business had been subjected to that amount of expense; in other words, the toll department was required not only to keep its own plant in repair but also to assist in repairing exchange equipment. Column six of Lester's compilation recites the items. It terminates with the sum $615,980.02. The two principal items in which the commissioner, who followed Lester's computations, differed with the company are current maintenance and taxes. Current maintenance includes station removals and changes; that is, the expense of changing and removing telephones. The total 1933 expense of removing and changing telephones amounted to $367,-992. The company deemed $4,178 of this item as wholly local (private exchanges, etc.) and $358,986 as arising from joint use. By a time-use method which considered the use to which the equipment was applied and also the time for which it was thus employed, the company determined that $348,364 of the joint-use portion of this expense was assignable to exchange. That sum plus $4,178 made a total charge to exchange of $352,543. The commissioner reduced it to $282,323, stating, as will be seen from re-reading the portion of his opinion already quoted, that his distribution was made ''in accordance with the commercial expense.'' Commercial expenses were directory expenses, sales expense, advertising, etc.

We cannot understand how the distribution of these expenses affords a correct basis for distributing the station removal expense; especially do we not understand the justice of this distribution when the time-use basis is available. The witnesses described in great detail, not only orally but also by the use of extensive charts, the manner in which time-use is determined. Their explanation indicates that the equipment itself can be made to record with accuracy the use to which it

has been applied. Time-use was employed for the purpose of distributing many of the other items of expense. We are clearly satisfied that Dresslar's distribution of this item should not have been disturbed, and that the commissioner erred when he took the action above described.

■ The 1933 taxes amounted to $1,059,656.94. Dresslar's station-to-station distribution assigns $757,254.49 to exchange. Lester's amount was $717,293.61, a difference of $39,960.88. It was accepted by the commissioner and constituted an effort to have exchange bear 65.47 per cent of the total Oregon tax. The commissioner deemed that 65.47 per cent of the company's total Oregon property was devoted to exchange service. Apparently in applying this percentage he made a slight error in multiplication, which accounts for the fact that $717,293 is not exactly 65.47 per cent of the total tax. Dresslar's distribution of the tax took into consideration the fact that the total includes not only personal and real property taxes but also federal and franchise taxes. Since franchise taxes are wholly associated with exchange operations he allocated them exclusively to exchange. The balance of the tax he assigned in accordance with the ratios representing the apportionments of exchange and toll property. We believe that this method conformed closer to the needs of the situation than the commissioner's, and, like the circuit court, adopt it.

The above analysis of the tax and station removal items of expense indicates that the commissioner required the toll department to bear all expenses incurred between stations in rendering toll service, and that he evidently found that these expenses were $615,980.02 more than the company believed them to be. We have shown in our analysis of the tax and station removal expenses, we believe, that he made errors in his calculations.

 Let us now determine whether the commissioner was warranted in requiring toll to bear all of this additional expense without assigning to it any exchange revenue. In his order the commissioner stated: "The payment made by the subscriber for exchange service is not a part payment for exchange and toll service." That statement is not tantamount to saying that the payment made by a toll patron includes payment not only for the toll service but also for the exchange service rendered by the company incidental to the toll service. In our opinion, the commissioner's statement is not supported by any evidence, and likewise we believe there is no evidence which indicates that the payment made for a long distance message is based upon a station-to-station basis. Yet it will be observed that the commissioner's order compels the toll department to bear all of the expense from station to station. His action would have been entirely proper if the evidence indicated that toll rates are based upon a station-to-station basis. The manner in which these circumstances affect the profits of the enterprise is developed in the evidence. In a preceding paragraph we quoted an exhibit prepared by Lester which indicates that the company's books showed that for the year ending December 31, 1933, the toll department (intrastate and interstate) had a net revenue of $101,326.64. As already indicated, the fair value of all of the company's Oregon property in 1933 was $31,500,000, and the fair value of its exchange properties was $20,790,000, leaving as the value of its toll properties $10,710,000. Therefore, net revenue of $101,326.64 constituted a return of .94 per cent upon the fair value of the toll property. But if we make the adjustments to toll revenue and expense that the commissioner directed (add $340,389.25 to revenue and $615,980.02 to expense) we have a loss of $174,264.13, or 1.63 per cent upon the fair value of toll property. However, the commissioner

found that the expense items include too much for depreciation, and calls attention to the fact that they also include a charge in favor of the American Telephone & Telegraph Company, which both he and the circuit court disallowed. Let us consider these two matters. It will be recalled that the commissioner prescribed a depreciation rate of 3.995 per cent. The rate would yield the depreciation fund $151,589 less than it received in 1933. If we use the depreciation rate 3.795 per cent, which his counsel suggests, the company's expenses would be reduced $216,898. We believe that the proper percentage to use in distributing these savings to toll is the percentage which the value of toll property ($10,710,-000) bears to the entire investment ($31,500,000) which is 34 per cent. Thirty-four per cent of $151,589 is $51,540.26, and 34 per cent of $216,898 is $73,745.32. The subtraction of either of these sums from $174,264.13 leaves a substantial loss.

We shall now consider the payment made to the American Telephone & Telegraph Company. The payment made to that company in 1933 ($95,644.27) is indicated in all of the compilations set forth in preceding paragraphs under the head of "General Services and Licenses" which, in a general way, denotes the consideration which the plaintiff received from the American Company. The circuit court, in disposing of this item, stated:

"The plaintiff has made an elaborate and convincing showing that the American Company furnishes it with advice and assistance in engineering, operating, financial and other matters, including the prosecution of experimental and research work in telephony, from all of which the plaintiff derives great benefit, and the cost of which to the American Company exceeds $95,644, the amount paid by the plaintiff pursuant to the terms of the contract. * * * We find it necessary to hold, however, that under the rule of law announced the plain-

tiff cannot be allowed this sum as an operating expense because the record fails to disclose with any degree of certainty the value and the cost to the American Company of the services *paid for* by the plaintiff. The sum of $95,644.00 was paid by it to the American Company under the license contract and not otherwise. The only obligation of the American Company under the contract is to give to the plaintiff the use of certain telephonic apparatus under the American Company's ownership of patent rights, and to pay the expense of prosecuting the infringements of its patents and to defend all patent suits brought for the use of instruments furnished. * * * The payment of $95,644.00, as we have said, was made for services covered by the contract. All the other services, so far as this record discloses, were a gratuity. It follows that the plaintiff has not sustained the burden of proof in this regard. * * * We would allow the claim for operating expenses made on account of the extra-contractual services if the proof had shown that the plaintiff had paid for them. Likewise, we would have allowed the claim for services performed under the contract if the proof had shown their value and cost. There is a failure of proof as to both these matters, and the commissioner's ruling is therefore sustained.''

The commissioner's disposition of this item was similar to that of the circuit court.

Thus, it is seen that the company received valuable and necessary service from the American Company, but that the expense was disallowed on procedural grounds. Apparently the company will need in the future service of the kind it has been receiving from its parent company, and very likely it will have to pay for it, whether it receives it from the American Company or some other source. Concerning the amount to be paid we express no opinion. In *Lindheimer v. Illinois Telephone Co.*, supra, the federal supreme court found no objection to similar payments made by the Illinois Company to the extent that the evidence sustained the

reasonableness of their amounts. But since the commissioner and the circuit court rejected the 1933 payment, we shall do likewise. Thirty-four per cent of $95,644 is $33,475.40. The latter added to $73,745.32 (excess depreciation determined on a basis of 3.795 per cent) totals $107,220.72. When this is deducted from $174,-264.13 there remains a net loss for toll of $67,043.41, or .626 per cent of the value of the toll property. It will be observed that this calculation gives effect to all of the commissioner's directions and employs a lower depreciation rate than he ordered. The circuit court found that in 1933 the exchange department earned a net profit of $733,555. It was found after ignoring as expense the sum paid the American Company, and also after reducing the depreciation charge as directed by the commissioner. The value of exchange properties was $20,790,000. Therefore, a profit from exchange of $733,555 would constitute a return of 3.5 per cent. If we deduct $314,177 (reduction directed by the challenged order) we have $419,378, or a return of 2 per cent on $20,790,000. If we deduct $67,043.41 (net loss from toll operation) we have $352,334.59 as the net revenue produced by exchange and toll, or a return of 1.12 per cent on $31,500,000.

The inquiry which resulted in the lowering of defendant's rates was instituted by the commissioner upon his own volition and was undertaken for the purpose of determining the fairness of its rates, practices, etc. The results showed, as we have pointed out, that the company's return from its 1933 Oregon operations was modest, and that one of its important departments would operate at a loss if his order went into effect. Without adjusting the rates of that department so as to render them profitable, the commissioner cast upon that department expenses far more burdensome than the company itself had imposed.

The commissioner certainly had the power to direct the company to distribute revenue and expense upon the station-to-station basis. We are also satisfied that he had the power to compel the company to employ that method in establishing its rates. He should, however, have been consistent, and should have employed the same basis in distributing expenses, property and revenue. The federal supreme court, in the language quoted in a preceding paragraph, indicated a preference for the station-to-station method, and we also believe that it is more likely to produce fair results than the board-to-board method. But to distribute expense and revenue upon a station-to-station basis after rates have been computed upon a board-to-board basis involves obvious difficulties. Dresslar's station-to-station compilation, which the circuit court largely embraced, is an effort to do justice under these difficulties without increasing toll rates. The commissioner endeavored to solve the difficulties by distributing expenses only upon the station-to-station basis. He thereby cast upon the toll department a very substantial loss, and, without offering any explanation, gave to toll no relief whatever. We believe that the two departments are sufficiently related so that the commissioner should have given toll some sort of relief if he desired to make these fundamental changes in the company's accounting system: *Minneapolis etc. Co. v. Minnesota,* 186 U. S. 257, (46 L. Ed. 1151, 22 S. Ct. 900) ; *Public Service Gas Co. v. Board of Public Utility Com.,* 87 N. J. L. 581, 597, (94 Atl. 634, L. R. A. 1918A 421) ; and see annotation Ann. Cas. 1916A 9.

Without analyzing the evidence further, we summarize the situation as follows: (1) The only evidence upon the subject indicates that the company's rates are established upon the board-to-board basis; (2) the company by reason of former orders of the commissioner's

predecessors has been assigning from toll to exchange a part of toll's revenues (1933 20 per cent, or $289,-455.83); (3) toll earned a small profit—.94 per cent in the year 1933; (4) the commissioner made no finding that toll rates compensate for all service between stations; (5) through his redistribution of expense and revenue, toll will operate at a loss of .626 per cent after the depreciation rate has been reduced to 3.795 and the payment to the American Company has been ignored; (6) notwithstanding the facts just mentioned the commissioner gave the toll department no relief in the form of adjusted rates or otherwise; (7) the combined income of toll and exchange after all adjustments have been made which the commissioner directed will constitute a yield of 1.12 per cent upon $31,500,000.

The circumstances just mentioned convince us that the commissioner's distribution of revenue and expense cannot be sustained. We approve the action taken by the circuit court.

We have now disposed of the issue of the distribution of revenue and expense. We have also come to a conclusion as to the fair value of the property. The sole issue that remains is whether the commissioner's rate reduction order will reduce the company's revenue to the point of confiscation. The circuit court found that the 1933 net revenue produced by intrastate toll was $14,402, and, since that finding is not criticized, we adopt it without setting forth the supporting data. Therefore, the facts which have already been found and which reveal the problems which remain to be solved may be summarized thus:

| 1933 | Fair Value of Property | Net Revenue | Rate of Return |
|---|---|---|---|
| Exchange | $20,790,000.00 | $733,555.00 | 3.53% |
| Intrastate Toll | 5,481,000.00 | 14,402.00 | 0.26% |
| Total Intrastate | $26,271,000.00 | $747,957.00 | 2.85% |

Giving effect to the rate reduction the figures are:

| 1933 | Fair Value of Property | Net Revenue | Rate of Return |
|---|---|---|---|
| Exchange | $20,790,000.00 | $419,378.00 | 2.02% |
| Intrastate Toll | 5,481,000.00 | 14,402.00 | .26% |
| Total Intrastate | $26,271,000.00 | $433,880.00 | 1.85% |

We realize that the validity of a rate order is not to be tested by the experiences of one year alone, especially when that year did not present normal business conditions. The returns which we have principally considered are those for 1933, a recovery year, when business was on the upgrade, but one which did not present normal conditions. A public utility cannot expect to have its rates so adjusted that when all other concerns are suffering losses it will enjoy prosperity. However, a public utility's rates are so graduated by the regulatory officials that it never enjoys the advantages of prosperity to the extent that other concerns do and, accordingly, its returns in time of business adversity ought not be reduced to the same extent as that of unregulated businesses. But, as stated, the company's 1933 experiences ought not be considered as the sole basis of determining the merits of the order under review.

The company's books enter the following as its net exchange income for Oregon:

| | |
|---|---|
| 1929 | $1,082,635.00 |
| 1930 | 1,137,451.46 |
| 1931 | 979,282.16 |
| 1932 | 939,811.22 |
| 1933 | 542,110.09 |

It will be recalled that the circuit court found that the company's 1933 net exchange income was $733,885.00. The difference between the sum just mentioned and $542,110.09 is due not merely to the fact that the circuit

court employed the depreciation rate, 3.995 per cent, in lieu of the rate employed by the company and ignored the American Company charge, but also due to the fact that the court increased exchange revenue through the application of the station-to-station method. The circumstances just mentioned caused the court to deem 1933 net exchange revenue as $733,555.00. Employing the same process for determining net exchange revenue for the other years listed above, we have the following:

| | Net Exchange Revenue | 6 Per Cent Upon Fair Value of Exchange Property |
|------|---------------------|------------------------------------------------|
| 1929 | $1,310,000.00 | $1,127,101.00 |
| 1930 | 1,425,792.00 | 1,240,445.00 |
| 1931 | 1,341,872.00 | 1,285,335.00 |
| 1932 | 1,226,666.00 | 1,273,660.00 |
| 1933 | 733,555.00 | 1,251,941.00 |
| | $6,037,885.00 | $6,178,482.00 |

By deducting $314,177.00 (reduction due to the decreased rates directed by the order under attack), we have the following:

| 1929 | $ 995,823.00 | $1,127,101.00 |
|------|---------------|---------------|
| 1930 | 1,111,615.00 | 1,240,445.00 |
| 1931 | 1,027,695.00 | 1,285,335.00 |
| 1932 | 912,489.00 | 1,273,660.00 |
| 1933 | 419,378.00 | 1,251,941.00 |
| | $4,467,000.00 | $6,178,482.00 |

The amount of the deduction resulting from the commissioner's order should be greater than $314,177 for all years prior to 1933 because from 1929 to 1933 the company's volume of business was much larger than in 1933. A net profit of $6,037,885 resulting from five years of operation would constitute a return of 5.79 per cent upon the fair value of exchange property. A

profit of $4,467,000 earned in five years would consti-
tute a return of 4.29 per cent.

In the calculations just made we deemed the fair
value of the exchange property as $20,825,000. It was
not that precise amount in each of the five years, but
the use of that sum, we believe, serves the needs of
practical justice.

The above follows the procedure generally pursued
in suits of this character brought for the purpose of
testing the validity of rate orders entered by public
regulating bodies; that is, we found the fair value of
the property, reviewed revenue and expense, and made
a finding concerning net revenue and yield. Our con-
sideration of the facts convinces us that if the rate
reduction order entered by the defendant had become
effective the company's return upon the fair value of
its exchange properties would have been 4.29 per cent
over the course of several years. Its intrastate toll
department would have reduced the yield to approxi-
mately 3 per cent.

The excessive accumulation in the Oregon deprecia-
tion fund cannot be employed for the purpose of reduc-
ing future rates: *Board of Public Utility Commissioners
v. New York Tel. Co.,* 271 U. S. 23 (70 L. Ed. 808, 46 S.
Ct. 363). As was pointed out in the decision just cited,
the fund, whether excessive or not, belongs to the
company. The commissioner's counsel states: "It is
expressly and explicitly admitted that under the deci-
sions as they now stand (whether or not they be reason-
able or sound), these past accruals of excessive depreci-
ation charges do become the property of the company."

The management of the company is experienced
and no one has criticized its capability. Likewise no
one has criticized the efficiency of the company's plant
which, according to the evidence, employs the latest

devices that scientific research renders available. Through its affiliation with the American Telephone & Telegraph Company and its co-operation with other companies it receives much toll business which otherwise might not be available. The company's patrons are apparently satisfied with the service which it renders. The circuit court held that a yield of 6 per cent upon the fair value of the plant was necessary to avoid confiscation. It is unnecessary to make a finding in this regard because we are clearly satisfied that the company was entitled to a larger return than was proposed by the rates prescribed by the defendant. The period included in the above tables (1929 to 1934) embraced two years when business was close to capacity, one year when the number of subscribers was only slightly less than normal and another year which is commonly regarded as a recovery year. We are satisfied that when tested by the rules ordinarily employed in instances of this kind the rate order is invalid. We, of course, except the portion which prescribed the depreciation rate.

■ But the defendant contends that the method which we have thus far pursued for the purpose of testing the fairness of his rates is unnecessary and should not have been employed. He argues that the process used by the United States supreme court in *Lindheimer v. Illinois Bell Telephone Company*, 292 U. S. 151 (78 L. Ed. 1182, 54 S. Ct. 658), should be employed in the present case. In arguing in behalf of the application of that test, he depends upon the history of the plaintiff company and its present financial condition. He claims that those circumstances show that the company is in a highly prosperous condition. So insistent is the defendant that the present case parallels the Lindheimer case that his opening brief argues nothing else.

*Lindheimer v. Illinois Bell Telephone Company,*
supra, has an extensive court history. It first entered
the courts as *Illinois Bell Telephone Co. v. Moynihan,*
38 Fed. (2d) 77. Later chapters of the litigation appear
in 282 U. S. 133 (75 L. Ed. 255, 51 S. Ct. 65), and 3 Fed.
Supp. 595. In the course of the litigation three memo-
randum decisions concerning it were issued by the
federal supreme court: 283 U. S. 794 (75 L. Ed. 1419, 51
S. Ct. 482) ; 283 U. S. 808 (75 L. Ed. 1427, 51 S. Ct. 646) ;
269 U. S. 531, 70 L. Ed. 397, 46 S. Ct. 22). The contro-
versy had its inception when the Illinois Bell Telephone
Company filed a suit charging that a rate reduction
ordered by the Illinois Commerce Commission August
16, 1923, imposed confiscatory rates. The new rates
were applicable to four classes of coin box telephones
operated by the company. Six years passed before the
cause came on for trial in the United States district
court, which at the conclusion of the hearing held that
the rates were confiscatory. Upon appeal, the United
States supreme court reversed this order and re-
manded the cause. It is believed that the district court
had failed to distinguish sufficiently between intra-
state and interstate plant and the revenue and expenses
attendant upon the two divisions. In remanding the
cause, it directed that specific findings be made as to
the value of the property employed in the company's
intrastate business in Chicago, together with the reve-
nue and expense incident thereto. Because the American
Telephone & Telegraph Company owned 99 per cent of
the stock of the Illinois Company and about the same
amount of stock of the Western Electric Company, the
court directed that specific findings be made after
examination of the facts as to the net earnings of the
Western Electric Company upon its sales to the Illinois
Company, and of expenses incurred by the American

Company in rendering its services to the Illinois Company. Upon retrial the district court entered findings upon all of these subjects and again held that the rates prescribed by the commission were confiscatory. This was more than nine years after the rate order was made. An appeal was again prosecuted to the federal supreme court which, in disposing of the appeal, entered the Lindheimer decision with which we are now concerned. It again reversed the decision of the district court. The court found that it was unnecessary to determine the value of the plant or engage in most of the other calculations which generally constitute features of suits testing the validity of rate orders because, according to its analysis of the record, the evidence submitted by the company failed to serve its intended purpose—it discredited itself. By instituting the suit the company had assumed the burden of proving that the rate order, which was presumptively valid, established confiscatory rates, but the entire record indicated that the company earned generous dividends prior to the order and would continue to do so under the new rates. We shall now review briefly the facts which we think support the statements just made.

It will be recalled that the order was entered by the commission August 16, 1923. The first district court decision was announced six and one-half years later, and the second nine and one-half years later. While this litigation was pending the enforcement of the rate order was suspended by the district court's injunction. The final decision was announced by the federal supreme court April 30, 1934. Thus, approximately nine years elapsed between the rate order and the second district court decision during which the financial experiences of the company were constantly entered upon its books from whence they later came before the

court. These circumstances enabled the court to approximate the effect of the order during the very time in which it would have been in effect had its enforcement not been enjoined. The total revenue which the company derived from the coin box telephones, to which the rate order was confined, as contrasted with the company's total revenue, is not disclosed by the decision. However, the latter states that the challenged order "reduced rates applicable to a large part of the intrastate service of the appellee. * * * The court (district) found that, if the rates in suit had been effective, appellee's net earnings on its intrastate business would have thereby been reduced to the extent of $1,541,668 for 1923 * * *." Again referring to the district court and the year 1923, the supreme court stated: "The amount found by the court to have been available for return in that year is $6,646,183." It meant net revenue from intrastate Chicago business. We quote further from the decision: "As thus estimated, the net revenue available for return from the intrastate business in Chicago under the rates in suit would have been as follows: 1923, $5,104,515 * * *." Since the reduction upon the coin box telephones, had it gone into effect, would have reduced net revenue from $6,646,183 to $5,104,515, or a reduction of 23 per cent, the revenue produced by the coin box telephones must have constituted a very substantial part of the total revenue of the company. The latter did business throughout Illinois, but the rate order was applicable only to Chicago where the intrastate plant comprised 60 per cent of the company's entire investment.

We come now to a consideration of the circumstances related in the decision which discredited the proof submitted by the company in support of its charge that the new rates were confiscatory. The court set forth

a table which began with the year 1923 and ended with the year 1932 in which it listed (a) the company's net intrastate Chicago income as shown by its books; (b) its net Chicago intrastate income as determined by the district court; and (c) the amounts of net income which, under the district court's finding of fair value, would have been necessary to avoid confiscation. This table indicates that the company's books showed that net Chicago intrastate income in 1923 was $5,347,533, and that the district court, after making some additions on account of excessive depreciation charges and improper disbursements, found that the company's real net Chicago intrastate income in that year was $6,646,183. It also found that $9,315,000 was required to give the company a fair return upon the fair value of its property. Similar figures for each of the nine years are given. For instance, in 1931 they were $8,494,616, $9,826,299 and $11,641,500. An inspection of the table indicates that if the evidence submitted by the company was truthful and if the findings of the district court were correct, the company, in each year beginning with 1923 and running through 1932, fell short of a fair return by a substantial margin. For instance, in 1923, 1928 and 1931 the shortage was, respectively, $2,668,817, $4,161,420 and $1,815,201. Referring to this table, the court stated: "On this showing, the findings if accepted would compel the conclusion that when the Commission's order was made in 1923, not only the new rates, but the existing rates as well were grossly confiscatory. * * * But, instead of challenging the existing rates as constituting an invasion of constitutional right, appellee when summoned by the Commission, in September, 1921, in the proceeding which led to the order now under review, asserted that the existing rates were just and reasonable." It then

quoted the following from the company's answer: "Its rates and charges heretofore approved and authorized by the aforesaid order of the Public Utilities Commission of Illinois, entered on the 20th day of December, 1920, and now in full force and effect, are just and reasonable." Having made these observations which evidently had persuaded the court that the facts were not as indicated by the company's evidence, the decision set forth a brief resume of the financial history of the company, which it stated repelled "the suggestion that during all these years it was suffering from confiscatory rates." This history indicated that the company's capital stock in 1901 was $70,000,000 and rose to $150,000,000 in 1930. In the meantime, its funded debt remained at approximately $50,000,000. The decision stated: "During this period appellee paid the interest on its debt and 8 per cent dividends on its stock." Its "fixed capital reserves" rose from $37,575,-004 in 1923 to $69,242,667 in 1931. In the meantime, its surplus and undivided profits increased from $5,-600,326 to $23,767,381. The book cost of its total plant and general equipment which was $145,984,084 in 1923 increased to $291,259,580 at the end of 1931. Next, the court reviewed somewhat similar data limited to the plant in the Chicago area, and observed: "This actual experience of the Company is more convincing than tabulations of estimates. In the face of that experience, we are unable to conclude that the Company has been operating under confiscatory intrastate rates. Yet, as we have said, the conclusion that the existing rates have been confiscatory — and grossly confiscatory — would be inescapable if the findings below are accepted. In that event, the Company would not only be entitled to resist reduction through the rates in suit, but to

demand, as a constitutional right, a large increase over the rates which have enabled it to operate with outstanding success. Elaborate calculations which are at war with realities are of no avail. The glaring incongruity between the effect of the findings below, as to the amounts of return that must be available in order to avoid confiscation, and the actual results of the Company's business, makes it impossible to accept those findings as a basis of decision." The court took note of excessive operating expenses which the company had entered upon its books. Referring to payments made by the Illinois Company to the American Company, it stated: "In 1923 the overpayment to the former company, treating its outlay, or the cost of its service to its subsidiary, as the measure of the operating expense, was found to be $573,819; the average of the annual overpayments, as found for the years 1923 to 1927, inclusive, amounted to $545,443. It should be noted that on the same basis of adjustment there would have been an increase (averaging $256,036) in operating expenses for the years 1929 to 1931, when the cost of service exceeded the license payments." Next, the court considered the excessive amount which the company credited to its depreciation reserve account. It stated that the commission's order had provided for combined maintenance and replacement allowance, which included an allowance for depreciation reserve, and that the district court in considering the effect of the ruling had found that it would "reduce the amount charged for depreciation to the operating expenses in 1923 to the extent of about $1,800,000." The decision set forth a table beginning with the year 1923 and ending with 1931 in which it compared the district court's allowances for depreciation with the actual charges made by the

company. This table shows, for instance, that in 1923 the court reduced the allowance by only $222,000. In 1929 the reduction was $436,000. These facts are followed with a table which sets forth the amounts accumulated in the depreciation reserve and the actual depreciation existing in the plant. For instance, it shows that in 1923 the existing depreciation was $11,992,000 while the reserve held $26,797,000. In 1931 the existing depreciation was $15,828,000 and the amount in the account was $48,362,000. In making this comparison the decision quoted the company's contention that "the existing depreciation in the property, physical and functional, does not exceed 9 per cent. in the years 1923 to 1928 and 8 per cent. thereafter." The court found the company's explanation of the large difference between the existing depreciation and the excessive provision made therefor insufficient. Proceeding, the court took note of the manner in which expenditures for current maintenance minimizes depreciation and avoids the necessity of resorting to the depreciation reserve account. A tabulation forming a part of the opinion shows that the company's charges for current maintenance and depreciation "range from over 30 per cent to nearly 40 per cent of the total amounts charged by the company to operating expenses." These comparisons are followed with the conclusion: "It cannot be said that the Company has established that the reserve merely represents the consumption of capital in the service rendered. Rather it appears that the depreciation reserve to a large extent represents provision for capital additions over and above the amount required to cover capital consumption. This excess in the balance of the reserve account has been built up by excessive annual allowances for depreciation charged to operating ex-

penses." After mentioning the fact that the burden of sustaining the verity of its accounts and book entries rested upon the company, the decision declared: "We find that this burden has not been sustained. * * * We find this point to be a critical one. The questionable amounts annually charged to operating expenses for depreciation are large enough to destroy any basis for holding that it has been convincingly shown that the reduction in income through the rates in suit would produce confiscation. * * * The company has had abundant opportunity to establish its contentions. In seeking to do so, the company has submitted elaborate estimates and computations, but these have overshot the mark. Proving too much, they fail of the intended effect. * * * It is enough that the rates have been established by competent authority and that their invalidity has not been satisfactorily proved. The decree below is reversed."

Summarizing the above, we observe that the company, having admitted that the rates under which it had been operating, and which continued in effect during the nine years the cause pended in the court, were fair and reasonable, was met with findings which its evidence had persuaded the district court to enter and which indicated that those rates were grossly confiscatory. The company's experience in the nine-year period showed that besides paying its debts, interest upon its indebtedness, 8 per cent dividends upon its capital stock, and adding $18,000,000 to its surplus, together with $31,600,000 to its reserves, it had earned hidden profits in the form of excessive accumulations in its depreciation reserve and payments to the American Company, its owner. This showed prosperity. The

same circumstances also showed that the district court's findings that net income was far short of needs was erroneous, and that the evidence submitted by the company upon which the district court based these findings was in conflict with the facts. The company had the burden of proving that the rate order, presumptively valid, prescribed confiscatory rates, but the proof with which it attempted to do so did more than that—it showed that the excessive depreciation charge and unwarranted payments to the American Company more than offset the reduction in net income which would result from the new rates. Stated otherwise, the proof showed that the rate reduction order would not impair the company's ability to maintain its credit standing and earn generous dividends for its stockholder (the American Company). Let us consider corresponding facts concerning the present plaintiff.

Unlike the district court in the Illinois case, the circuit court in the present case gave full effect to the reduction directed by the commissioner in the depreciation reserve account. Although in the Illinois case the court merely reduced the amount of the annual payment to the American Telephone & Telegraph Company (reduced it to the amount of the cost sustained by the American Company in rendering the service) the circuit court eliminated the payment entirely for 1933. In the Illinois case the company admitted that the rates in effect prior to the entry of the challenged order were fair and reasonable, in the present case the company made no such admission; to the contrary, it alleges: "Rates and charges of plaintiff in the State of Oregon, established and in force during the years 1931, 1932, 1933 and down to the present date in 1934, and which

remain in effect under said Order No. 2490 until November 1, 1934, were and are not compensatory, and were and are less than just and reasonable.'' Further, the record indicates that the company has consistently challenged the reasonableness of the existing rates, contending that they are non-compensatory. The Illinois Company paid 8 per cent dividends upon its stock during the nine years immediately following the entry of the rate reduction order. The average amount paid by the plaintiff company for the 21½ year period (1913 to July 1, 1934, both inclusive) was 5.24 per cent. In determining that average we included the company's preferred (6 per cent) and its common stock. In the years 1913 to 1924, both inclusive, the company paid nothing on its common stock. In 1925, 1933 and the first six months of 1934 (last period available) it paid 6 per cent on that stock. In 1926 to 1932, both inclusive, the dividend was 7 per cent. In 1932 the earnings of the system were $1,337,793.20 short of the dividend requirements, and dividends to that extent were paid out of surplus. In 1933 for similar reasons $1,700,989.60 dividends were paid out of surplus, and in the first six months of 1934 $743,282.53 dividends were paid out of surplus.

From 1913 to 1922 the amount of the preferred stock was $32,000,000; in the next two years it was $57,000,000; and in 1924 it rose to $82,000,000 where it has remained ever since. In 1913 the amount of the common stock was $18,000,000; in 1925 it was $43,000,-000; in 1927 it was increased to $93,000,000; and in 1930 it rose to $180,500,000. The latter increase is explained in 34 Cal. R. C. 360, and was due to the fact that the American Company accepted $87,500,000 of the common stock of the plaintiff company in satisfac-

tion of a note signed by that company and owned by the American Company. The note was given when the Pacific Company purchased a telephone concern in Southern California.

The supreme court decision in the Lindheimer case stated that the surplus and undivided profits of the Illinois Company in the following years were the following amounts:

| 1923 | $ 5,600,326 |
|------|-------------|
| 1930 | 22,907,654 |
| 1931 | 23,767,381 |

Corresponding figures for the Pacific Company are as follows:

| 1923 | $ 8,057,818 |
|------|-------------|
| 1930 | 8,797,827 |
| 1931 | 9,501,167 |

In the years 1923 to 1931 the Illinois Company's surplus and undivided profits multiplied 4.24 times, while the Pacific Company's similar item multiplied 1.18 times. The Illinois Company's surplus and undivided profits were 8.16 per cent of its fixed capital while the Pacific Company's similar account was 2.25 per cent of its fixed capital. We have mentioned the fact that in 1932, 1933 and 1934 the Pacific Company resorted to its surplus to meet its dividend requirements. This circumstance reduced its surplus and undivided profits to $6,400,912 on June 30, 1934, which was 79.44 per cent of the 1933 figure, and 67.37 per cent of the 1931 figure, a reduction of $3,100,255 in two and one-half years. The Pacific Company's depreciation reserve increased from $12,615,173.50 in 1916 to $56,636,997.39 in 1933.

The record in the case before us, unlike the record in the Lindheimer case, affords but little information con-

cerning payments made by the Pacific Company to the American Company and purchases made from the Western Electric Company. It indicates, however, in the language which we quoted, that the services rendered by the American Company to the Pacific Company were necessary and valuable. In determining reproduction cost new the circuit court ignored the 10 per cent price increase put into effect in 1930 by the Western Company because the company had failed to show the necessity for the increase.

A difference between the plaintiff and the Illinois Telephone Company which we have not so far mentioned is the fact that while the latter apparently was an operating company only the Pacific Company is not only an operating but also a holding company. For instance, in 1932 when it paid $17,555,000 dividends it received non-operating income to the amount of $9,-759,363 (55 per cent of $17,555,000). Of this sum $8,750,062 came as a dividend upon stock of the Southern California Telephone Company.

The book cost of the Illinois Company's plant increased from $145,984,084 in 1923 to $291,259,580 in 1931, or 99.5 per cent. The book cost of plaintiff's plant increased from $140,242,674 in 1923 to $274,446,618 in 1933, or 95 per cent.

The foregoing figures cover the entire operations of the system, not Oregon alone. In 1933 the company's total investment in telephone plant was $247,446,618.55; in Oregon alone it was $34,859,184.62. Thus, its investment in Oregon was only 14.1 per cent of the total. The revenue which permitted the company to pay the aforementioned dividends was produced by the entire system, not merely by telephones operated directly by the company but also by those operated by subsidiaries. The value of the plant in Oregon in 1933 was 8.26 per

cent of the value of the entire system. In 1933 83.4 per cent of the total property of the company in Oregon was devoted to intrastate telephone use and, accordingly, only 6.9 per cent of the system's investment in telephone property was devoted to intrastate use in this state.

The following figures pertain to Oregon operations alone. In 1923 the company had 103,410 stations; in 1930 (peak) the number was 142,358, and in 1933 it was 110,709. In the Illinois case the Chicago telephones increased from 690,000 in 1923 to 987,000 in 1929. The Oregon increase between 1923 and 1929 was 37 per cent —the Chicago increase was 43 per cent. The Oregon gross and net additions to the plant, exchange and toll, are indicated in a paragraph near the beginning of this decision. From 1916 to and including 1933 the net additions were $23,715,332. In the Illinois case "a greater amount of plant was added new to the property than was in service at the beginning of the term" (9 years). The Oregon depreciation fund in 1923 amounted to $4,127,000, and by the end of 1933 it was $8,280,000. The following is a comparison of the amounts in the fund with the existing depreciation:

| | Existing Depreciation | Depreciation Reserve | |
|---|---|---|---|
| 1922 | $1,879,020.00 | $3,618,021.50 | 92.5% |
| 1931 | 2,022,887.50 | 6,050,025.25 | 199.1% |
| 1932 | 2,022,887.50 | 6,275,379.07 | 210.2% |
| 1933 | 2,022,887.50 | 6,993,613.72 | 242.9% |

As in the Illinois case the company claims that its property was in 92 per cent condition. The combined Oregon current maintenance and depreciation expense bore to operating expenses approximately the same relationship as in the Illinois case. This table shows that in the past the company's credit to the depreciation

fund has been excessive. In that respect the facts of this case are similar to those in the Lindheimer case. However, the commissioner reduced the depreciation rate for the future, and, unlike the Illinois district court, the circuit court sustained the commissioner in that part of his order.

In order to indicate the extent to which the operations in Oregon have exceeded or fallen short of Oregon's share of the company's interest and dividend requirements, a company witness prepared the following table:

| Year | Surplus | Deficit |
|------|---------|---------|
| 1913 | $ 64,144 | $ |
| 1914 | | 52,247 |
| 1915 | | 163,310 |
| 1916 | | 188,270 |
| 1917 | | 324,418 |
| 1918 | | 255,149 |
| 1919 | | 592,244 |
| 1920 | | 562,473 |
| 1921 | | 263,393 |
| 1922 | | 132,622 |
| 1923 | | 20,181 |
| 1924 | 486,370 | |
| 1925 | 198,737 | |
| 1926 | 290,798 | |
| 1927 | 280,761 | |
| 1928 | 577,226 | |
| 1929 | 340,536 | |
| 1930 | | 16,911 |
| 1931 | | 421,783 |
| 1932 | | 719,993 |
| 1933 | | 1,036,377 |
| 1934 ....(to June 30).... | | 434,147 |
| Totals | $2,238,572 | $5,183,518 |
| Deficit | | $2,944,946 |

This table is not entirely accurate, but is the only one which any witness prepared. Its inaccuracy is due to the fact that the company charged excessive amounts for depreciation and may have paid undue sums to the American Telephone & Telegraph Company. Likewise, if the charges of the Western Electric Company were excessive after its price increase in 1930 went into effect, another element is present which tends to show that the profits since that time were greater than the company reported. However, the record indicates the company's practices are general, and therefore this table probably affords a correct basis for a comparison of the company's Oregon operations with those elsewhere.

The commissioner's brief contains a table which shows that after the adjustments to revenue and expense have been made, which the circuit court approved, Oregon, in the period 1922 to 1933, both inclusive, met its share of the company's dividend and interest requirements, and left a surplus in the company's treasury of $4,482,930. These adjustments reduce the depreciation rate to 3.995, eliminate the charge of the American Company, and employ the station-to-station method for distributing revenue and expense. They also give effect to the low salary schedule to which the company resorted during the depression. In the following table we set forth in Column 1 net revenue as thus adjusted, and in Column 2 the same figures after $314,177 (rate reduction) has been deducted. The remaining two columns show the extent to which Oregon

would have fallen short or exceeded its part of interest and dividend requirements.

| | Adjusted Net Revenue | Adjusted Net Revenue After Deducting $314,177 | Deficit | Surplus |
|---|---|---|---|---|
| 1922 .... | $1,106,546 | $ 792,369 | $ 36,787 | $................ |
| 1923 .... | 1,386,742 | 1,072,565 | ................ | 123,110 |
| 1924 .... | 2,000,461 | 1,686,294 | · ................ | 598,986 |
| 1925 .... | 1,989,390 | 1,675,213 | ................ | 365,299 |
| 1926 .... | 2,102,521 | 1,788,344 | ................ | 403,924 |
| 1927 .... | 2,192,350 | 1,878,173 | ................ | 398,632 |
| 1928 .... | 2,448,627 | 2,134,450 | ................ | 562,154 |
| 1929 .... | 2,301,279 | 1,987,102 | ................ | 291,127 |
| 1930 .... | 2,349,431 | 2,035,254 | ................ | 110,281 |
| 1931 .... | 1,983,673 | 1,669,496 | 274,905 | ................ |
| 1932 .... | 1,498,941 | 1,184,764 | 713,732 | ................ |
| 1933 .... | 890,670 | 576,493 | 1,115,283 | ................ |

| | | | |
|---|---|---|---|
| Totals 1922-1933 .................... | | $2,140,707 | $2,753,513 |
| Net surplus 1922-1933 ................................ | | | · 612,806 |
| | | | |
| Totals 1929-1933 .................... | | $2,103,920 | $ 401,408 |
| Net deficit 1929-1933 ............. | | 1,702,512 | |

Since the rate reduction order was not made until October 11, 1934, it was not applicable to any of the years mentioned in this table. However, the commissioner's table employed those years and they afford a basis for approximating the effect of the order. This circumstance also develops an important difference between the Illinois and this case: in the former the court had before it the facts pertaining to the period of time in which the rate order would have governed the company's operations but for the injunction; in the present case, in the absence of that data, we are compelled to resort to other years. As a matter of fact, the reduction of $314,177 (directed by the commissioner's order) would have been much greater for every year except 1933 because the volume of business in all

years mentioned in the table was larger than in 1933. A larger deduction besides increasing the size of deficits could readily convert a surplus into a deficit.

The following table indicates, as does other data already mentioned, that many of the items of the company's operating expenses have constantly increased. The table also shows that the fixed capital has increased while the number of employees has declined. Possibly, the former is the cause of the latter. The incompleteness of the table is due to the absence of data:

| | Fixed Capital per 1000 Calls | Fixed Capital per Station | Percentage Increase in Number Employees Over 1917 | Percentage Increase in Wages Over 1917 | Annual Tax per Station |
|---|---|---|---|---|---|
| 1913 | ---------- | ---------- | ---------- | ---------- | $1.51 |
| 1914 | ---------- | ---------- | ---------- | ---------- | 1.90 |
| 1915 | ---------- | ---------- | ---------- | ---------- | 2.07 |
| 1916 | ---------- | ---------- | ---------- | ---------- | 1.52 |
| 1917 | ---------- | ---------- | ---------- | ---------- | 1.62 |
| 1918 | ---------- | ---------- | (4.80) | 23.74 | 2.13 |
| 1919 | ---------- | ---------- | 17.67 | 42.01 | 2.23 |
| 1920 | ---------- | ---------- | 22.18 | 67.58 | 3.72 |
| 1921 | ---------- | ---------- | 27.27 | 71.69 | 4.38 |
| 1922 | ---------- | ---------- | 40.28 | ---------- | 3.91 |
| 1923 | $ 98.26 | $203.70 | 20.31 | ---------- | 4.46 |
| 1924 | 99.76 | 202.18 | 14.74 | ---------- | 4.52 |
| 1925 | 104.98 | 211.68 | 17.86 | ---------- | 6.12 |
| 1926 | 105.11 | 208.90 | 12.96 | ---------- | 7.00 |
| 1927 | 102.22 | 207.09 | 6.05 | ---------- | 6.59 |
| 1928 | 106.41 | 214.17 | 17.14 | 98.17 | 6.22 |
| 1929 | 108.12 | 234.19 | 34.04 | 102.74 | 6.87 |
| 1930 | 119.53 | 243.39 | 6.19 | 118.72 | 6.95 |
| 1931 | ---------- | ---------- | 2.40 | 121.92 | 7.63 |
| 1932 | ---------- | ---------- | .43 | 119.18 | 8.20 |
| 1933 | ---------- | 302.55 | (1.30)* | 127.40 | 9.44 |

* ( ) denotes a decrease.

The taxes upon the Oregon property of the company have increased from 4 per cent of the gross revenue

in 1913 to 15.45 per cent in 1933. In 1913 the tax was 12 cents per month per telephone; in 1933 it was 79 cents. It multiplied itself six and one-half times in 20 years. The commissioner declared: "If the taxes were reduced to the 1913 or 1916 basis, rates could be reduced on this item alone 66 cents a month per subscriber." That reduction would be much more than the one made by the attacked order. Wages increased, as is shown in the above table, 127.40 per cent over the 1917 scale. In the meantime, the number of stations increased only 59.49 per cent; in fact, so far as we have been able to observe, virtually all items of expense increased. The number of employees showed a decrease. In the meantime, the fixed capital per station and per thousand calls showed a steady increase. The increase from 1923 to 1933 was virtually $100 per thousand calls. Thus, through a larger fixed capital the company was able to transact a larger volume of business with a smaller number of employees.

The above will have to suffice as an analysis of the facts which show the financial condition of the company. We do not believe that the company's condition is so prosperous, and that its improper accumulation of funds (depreciation reserve and payments to the American Telephone & Telegraph Company) have been shown to be so excessive that the commissioner's rate order must be sustained. For 12 years out of the last 22 the company paid no dividends on its common stock. In the 22-year period its average rate was 5.24 per cent, as contrasted with 8 per cent for the Illinois Company. Out of the 10 years in which it made payments on its common stock it was compelled for three years to resort to its surplus. The latter is much smaller than that of the Illinois Company and has been rendered still smaller through these disbursements. Moreover the

Oregon business constitutes a minor part of the system's entire operations and appears to have failed to earn its fair share of the dividend and interest requirements. It is true that the company's capital stock increased greatly, but this was due to the incoming of new money and did not arise from the conversion of surplus into capital issues. The need for new capital arose largely from its operations in Southern California. The impossibility of assuming that the Oregon operations accounted for the general condition of the company, whatever it may have been, is indicated by the fact that in 1933 the Oregon gross revenue was only $6,857,187.42, while in the same year the company received dividend returns upon its Southern California Telephone Company stock of $8,750,062. For two reasons we believe that the Lindheimer rule is not available: First, it has not been shown that the company has earned anything better than reasonable dividends for its shareholders, and, second, Oregon is such a minor part in the company's affairs that the general condition of the company cannot be said to be a reflection of the results achieved by the Oregon rates.

Having tested the validity of the commissioner's order under both methods suggested by the parties, and having found that the order imposes rates that are confiscatory, it follows that the order is invalid and that the circuit court's decree must be sustained.

Costs and disbursements will not be allowed in either court.

BEAN, C. J., and BAILEY, KELLY, BELT and RAND, JJ., concur.

LUSK, J., did not participate in this decision.